**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION; RAVINDER SINGH; THOMAS ODOM, <br> *Plaintiffs-Appellees*, <br><br> v. <br><br> ROB BONTA[*], in his official capacity as the Attorney General of the State of California; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; JULIE A. SU, in her official capacity as Secretary of the California Labor Workforce and Development Agency; PATRICK W. HENNING, in his official capacity as the Director of the Employment Development Department; LILIA GARCIA-BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, <br> *Defendants-Appellants*, | No. 20-55106 <br><br> D.C. No. 3:18-cv-02458-BEN-BLM |

---

[*] Rob Bonta has been substituted for his predecessor, Xavier Becerra, as California Attorney General under Fed. R. App. P 43(c)(2).

and

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
            *Intervenor-Defendant.*

CALIFORNIA TRUCKING
ASSOCIATION; RAVINDER SINGH;
THOMAS ODOM,
            *Plaintiffs-Appellees*,

            v.

ROB BONTA, in his official capacity
as the Attorney General of the State
of California; ANDRE SCHOORL, in
his official capacity as the Acting
Director of the Department of
Industrial Relations of the State of
California; JULIE A. SU, in her
official capacity as Secretary of the
California Labor Workforce and
Development Agency; PATRICK W.
HENNING, in his official capacity as
the Director of the Employment
Development Department; LILIA
GARCIA-BROWER, in her official
capacity as Labor Commissioner of
the State of California, Division of
Labor Standards Enforcement,
            *Defendants*,

No. 20-55107

D.C. No.
3:18-cv-02458-
BEN-BLM

OPINION

and

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
     *Intervenor-Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted September 1, 2020
Pasadena, California

Filed April 28, 2021

Before:  Sandra S. Ikuta and Mark J. Bennett, Circuit
Judges, and Douglas P. Woodlock,[**] District Judge.

Opinion by Judge Ikuta;
Dissent by Judge Bennett

---

[**] The Honorable Douglas P. Woodlock, United States District Judge for the District of Massachusetts, sitting by designation.

## SUMMARY[***]

### Federal Aviation Administration Authorization Act Preemption

Reversing the district court's order preliminarily enjoining enforcement, against any motor carrier doing business in California, of California's Assembly Bill 5, which codified the judge-made "ABC test" for classifying workers as either employees or independent contractors, the panel held that application of AB-5 to motor carriers is not preempted by the Federal Aviation Administration Authorization Act of 1994.

In *Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903 (2018), the California Supreme Court adopted the ABC test. The California legislature enacted AB-5, codifying the ABC test, in September 2019. California Trucking Association, a trade association representing motor carriers that hire independent contractors who own their own trucks, and two independent owner-operators filed suit, seeking to enjoin enforcement of AB-5. The district court granted a preliminary injunction against enforcement of AB-5 against any motor carrier doing business in California.

The panel held that California Trucking Association and its members had standing to bring this suit because they demonstrated that their policies were presently in conflict with the challenged provision, and they had a concrete plan

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to violate AB-5. In addition, CTA established that there was a threat to initiate proceedings against its members.

The panel held that the district court abused its discretion by enjoining the State of California from enforcing AB-5 against motor carriers doing business in California on the ground that such enforcement is preempted by the FAAAA. The panel held that because AB-5 is a generally applicable labor law that affects a motor carrier's relationship with its workforce and does not bind, compel, or otherwise freeze into place the prices, routes, or services of motor carriers, it is not preempted by the FAAAA.

Dissenting, Judge Bennett wrote that AB-5 both affects motor carriers' relationship with their workers and significantly impacts the services motor carriers are able to provide to their customers, and it therefore is preempted as applied to California Trucking Association's members.

**COUNSEL**

Jose A. Zelidon-Zepeda (argued), Deputy Attorney General; Tamar Pachter and Benjamin M. Glickman, Supervising Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General; Attorney General's Office, San Francisco, California; for Defendants-Appellants.

Andrew Kushner (argued) and Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, California, for Intervenor-Defendant-Appellant.

Andrew E. Tauber (argued), Miriam R. Nemetz, and Evan M. Tager, Mayer Brown LLP, Washington, D.C.; Robert R.

Roginson and Alexander M. Chemers, Ogletree Deakins Nash Smoak & Stewart P.C., Los Angeles, California; for Plaintiffs-Appellees.

David A. Rosenfeld, Weinberg Roger & Rosenfeld, Alameda, California, for Amicus Curiae California Labor Federation AFL-CIO.

Michael N. Feuer, City Attorney; Kathleen A. Kenealy, Chief Assistant City Attorney; Michael J. Bostrom, Assistant City Attorney; Danielle L. Goldstein and Christopher S. Munsey, Deputy City Attorneys; Office of the City Attorney, Los Angeles, California; Barbara J. Parker, City Attorney; Maria Bee, Erin Bernstein, Malia McPherson, Caroline Wilson, and Nicholas DeFiesta, Attorneys; Office of the City Attorney, Oakland, California; for Amici Curiae Office of the Los Angeles City Attorney and the City of Oakland.

Shannon Liss-Riordan and Harold Lichten, Lichten & Liss-Riordan P.C., Boston, Massachusetts, for Amicus Curiae California Employment Lawyers Association (CELA).

Joshua S. Lipshutz, Gibson Dunn & Crutcher LLP, San Francisco, California; Christopher D. Dusseault, Michelle L. Maryott, and Dhananjay S. Manthripragada, Gibson Dunn & Crutcher LLP, Los Angeles, California; for Amici Curiae Cal Cartage Transportation Express LLC, CMI Transportation LLC, and K&R Transportation California LLC.

Patrick J. Whalen, Ellison Whalen & Blackburn, Sacramento, California, for Amici Curiae American Dream Coalition and Western States Trucking Association.

Karen A. Booth and Jason D. Tutrone, Thompson Hine LLP, Washington, D.C., for Amici Curiae American Chemistry Council, Consumer Brands Association, Institute of Scrap Recycling Industries Inc., National Industrial Transportation League, National Shippers Strategic Transportation Council, and Fertilizer Institute.

Theane Evangelis, Blaine H. Evanson, and Max E. Schulman, Gibson Dunn & Crutcher LLP, Los Angeles, California; Steven P. Lehotsky and Emily J. Kennedy, U.S. Chamber Litigation Center, Washington, D.C.; Deborah White and Kathleen McGuigan, Retail Litigation Center Inc., Washington, D.C.; Stephanie Martz, National Retail Federation, Washington, D.C.; for Amici Curiae Chamber of Commerce of the United States of America, Retail Litigation Center Inc., and National Retail Federation.

Richard Pianka, ATA Litigation Center, Arlington, Virginia, for Amici Curiae American Trucking Associations Inc., Arizona Trucking Association, Nevada Trucking Association, Oregon Trucking Association, Washington Trucking Associations, Intermodal Association of North America, National Tank Truck Carriers, and Truckload Carriers Association.

Paul D. Cullen Sr., Paul D. Cullen Jr., Gregory R. Reed, and Daniel E. Cohen, The Cullen Law Firm PLLC, Washington, D.C., for Amicus Curiae Owner-Operator Independent Drivers Association Inc.

## OPINION

IKUTA, Circuit Judge:

The Federal Aviation Administration Authorization Act of 1994 (F4A or FAAAA) preempts any state law "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). California's Assembly Bill 5 (AB-5) codified a judge-made test (referred to as the "ABC test") for classifying workers as either employees or independent contractors. This appeal raises the question whether application of AB-5 to motor carriers is preempted by the F4A. Because AB-5 is a generally applicable labor law that affects a motor carrier's relationship with its workforce and does not bind, compel, or otherwise freeze into place the prices, routes, or services of motor carriers, we conclude that it is not preempted by the F4A. *See, e.g.*, *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014).

I

We first provide the context for this challenge. Before 2018, the California Supreme Court's framework for classifying workers as either employees or independent contractors was set forth in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989). *Borello* set out indicia of an employer-employee relationship as opposed to an independent-contractor relationship. *Id.* at 350–51. The indicia included "the right to control work," "the right to discharge at will, without cause," and, most

important here, "whether or not the work is a part of the regular business of the principal." *Id.*[1]

Almost thirty years after *Borello*, the California Supreme Court revisited the framework for classifying workers as employees or independent contractors for purposes of California's Industrial Welfare Commission (IWC) Wage Orders.[2] *See Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903, 912, 957 (2018). *Dynamex* adopted a standard commonly referred to as the "ABC" test. *Id.* at 957. Under Prong B of that test, a worker is presumed to be an employee and may be classified as an independent contractor only if

---

[1] The other indicia are:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; . . . . and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Borello*, 48 Cal. 3d at 351.

[2] As explained in *Dynamex*, California's IWC Wage Orders "are constitutionally-authorized, quasi-legislative regulations that have the force of law" and "impose obligations relating to minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees." *Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903, 913–14 & n.3 (2018).

"the worker performs work that is outside the usual course of the hiring entity's business." *Id.*[3]  The ABC test was thus significantly different from the *Borello* test:  while *Borello* considered "whether or not the work is a part of the regular business of the principal" as only one factor in the classification analysis, 48 Cal. 3d at 351, the ABC test presumed a worker was an employee unless the worker met that condition, *Dynamex*, 4 Cal. 5th at 957.

In September 2019, the California legislature enacted AB-5, which codified the ABC test and expanded its applicability. *See* Cal. Lab. Code § 2775.[4]  The statutory text of AB-5 classifies certain workers as employees, stating that a person "shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied":

---

[3] In full, the ABC test as enunciated by *Dynamex* provides that workers are presumed to be employees unless each of the following conditions is met:

> (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work . . . ; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed [for the hiring entity].

*Id.* at 957.

[4] AB-5 was originally codified at section 2750.3 of the California Labor Code.  Section 2750.3 was repealed effective September 4, 2020, and the ABC test is currently codified at section 2775 of the California Labor Code.  Cal. Lab. Code § 2775(b)(1)(A)–(C).

(A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact. (B) The person performs work that is outside the usual course of the hiring entity's business. (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

*Id.* § 2775(b)(1)(A)–(C).

AB-5 exempts certain occupations and services. *Id.* § 2778. It also contains a number of exemptions, including a "business-to-business" exception, which exempts any "business service provider" that meets several requirements. *Id.* § 2776(a).[5] If an exemption from AB-5 applies, then the *Borello* test controls the classification of workers as employees or independent contractors. *Id.* §§ 2775(b)(3), 2776(a), 2778(a).

---

[5] In September 2020, the California legislature revised some of AB-5's exemptions and created additional exemptions. *See* Assembly Bill 2257 (AB-2257); Cal. Lab. Code §§ 2775–2787. California voters added further exemptions by adopting Proposition 22 in November 2020. Proposition 22 provides that app-based drivers (drivers who provide delivery and transportation services in personal vehicles through a business's online application or platform) are independent contractors if certain conditions are met. *See* Cal. Bus. & Prof. Code § 7451 (codifying Proposition 22). Neither AB-2257 nor Proposition 22 changed the portion of AB-5 that set forth the ABC test itself.

California Trucking Association (CTA) is a trade association representing motor carriers that hire independent contractors who own their own trucks (referred to as "independent owner-operators") to transport property throughout California. The change from the *Borello* test to *Dynamex* and then to AB-5 concerned CTA. It viewed the new rule statutorily classifying a worker as an employee unless the hiring entity demonstrates that the worker performs "work that is outside the usual course of the hiring entity's business," *id.* § 2775(b)(1)(B), as effectively precluding the business model employed by CTA's members. *Cf.* Scott L. Cummings & Emma Curran Donnelly Hulse, *Preemption As A Tool of Misclassification*, 66 UCLA L. Rev. 1872, 1880 (2019).

A

In October 2018, after *Dynamex* was decided, CTA, along with Ravinder Singh and Thomas Odom, two independent owner-operators (the plaintiffs), filed this lawsuit against Xavier Becerra, the Attorney General of California; Julie Su, Secretary of the California Labor Workforce; and several other California officials (collectively referred to as "California" or "the state"), seeking a declaration that the F4A preempted the ABC test as applied to motor carriers. The district court allowed the International Brotherhood of Teamsters (IBT), a labor union that represents owner-operators classified as employees, to intervene. Dist Ct. Dkt. No. 31. In February 2019, IBT and California filed motions to dismiss. Dist. Ct. Dkt. No. 28, 29.

On September 24, 2019, about a week after the California legislature enacted AB-5, the district court dismissed CTA's amended complaint with leave to amend, explaining that it

was unclear whether the state would enforce *Dynamex* now that AB-5 had been enacted. On November 12, 2019, the plaintiffs filed the now-operative Second Amended Complaint, raising their challenge that the F4A preempts AB-5, and moved to enjoin its enforcement.

The district court held that CTA had standing and was likely to succeed on the merits of its claim. It therefore enjoined the state from enforcing AB-5 against any motor carrier doing business in California. The state and IBT timely appealed.

## B

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1). We review de novo whether CTA has standing. *Taylor v. Westly*, 488 F.3d 1197, 1199 (9th Cir. 2007). We review for an abuse of discretion the district court's grant of a preliminary injunction. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.[6] A district

---

[6] In our circuit, "serious questions going to the merits," as well as "a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in

court abuses its discretion when it "base[s] its decision on an erroneous legal standard." *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016) (citation omitted). Thus, the district court's "legal conclusions, such as whether a statute is preempted, are reviewed de novo." *Id.*

## II

Before reaching the merits, we must determine whether any plaintiff has standing to bring this pre-enforcement challenge. We focus on the associational standing of CTA.[7] To have standing, CTA must allege "a case or controversy within the meaning of Art. III of the Constitution," and not just "abstract questions not currently justiciable by a federal court." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979). There needs to be "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* at 298. We have listed three factors for evaluating "the genuineness of a claimed threat of prosecution": "[1] whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, [2] whether the prosecuting authorities have communicated a specific

---

the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted).

[7] An association has standing if "(1) its individual members would have standing in their own right, (2) the interests at stake in the litigation are germane to the organization's purposes, and (3) the case may be litigated without participation by individual members of the association." *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017). So long as standing can be shown for one plaintiff, we need not consider the standing of the other plaintiffs. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981). We note that the parties dispute only whether CTA's members would have standing in their own right.

warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). "At this very preliminary stage, plaintiffs may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden" of demonstrating Article III standing. *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) (cleaned up).

Applying these factors, we conclude that CTA has standing to bring this complaint. Based on the allegations in its complaint, CTA and its members have "demonstrated that their policies are presently in conflict with" the challenged provision, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1237 (9th Cir. 2018), and they have a concrete plan to violate AB-5. The complaint alleges that CTA and its members currently contract with independent owner-operators, rather than employees. CTA alleges that this is permissible under the *Borello* test but not under AB-5. The complaint further alleges that AB-5 requires CTA to terminate its independent-contractor arrangements and instead hire only employees, which (according to CTA) would require "an immediate and significant change in the plaintiffs' conduct of their affairs." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967). CTA's members are continuing with their current business practices, and thus CTA alleges that if not for the district court's injunction, its members would be in violation of AB-5. Because CTA's members are maintaining policies that "are presently in conflict with" AB-5, according to the allegations in the complaint, they are deemed to have articulated a concrete plan to violate it. *See Trump*, 897 F.3d at 1237.

Second, CTA has established that there is a threat to initiate proceedings against its members. Here, the state's refusal to disavow enforcement of AB-5 against motor carriers during this litigation is strong evidence that the state intends to enforce the law and that CTA's members face a credible threat. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–56 (9th Cir. 2000) (holding that "the Government's failure to disavow application of the challenged provision [is] a factor in favor of a finding of standing"). Plaintiffs are also deemed to have established that there is a realistic threat to initiate proceedings against them if the government has declared its "intention to enforce" the new law. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 533 (1925). In this case, the state has notified the regulated community that it intends to enforce AB-5. On December 13, 2019, several weeks before AB-5 took effect, the state sent letters to businesses notifying them that, under AB-5, the ABC test "must be used to determine the appropriate classification of workers in most occupations." And after AB-5 took effect, California began "moving aggressively to enforce" it. Carolyn Siad, *AB5 Gig Law Enforced*: *California Sues Uber and Lyft to Make Drivers Employees*, San Francisco Chronicle (May 5, 2020). The state has commenced a number of prosecutions against companies for misclassifying workers under AB-5. *See, e.g.*, Complaint, *People v. Uber Techs., Inc.*, No. CGC-20-584402 (Cal. Super. May 5, 2020).

As to the history of enforcement, this factor has "little weight" when the challenged law is "relatively new and the record contains little information as to enforcement or interpretation." *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010). CTA filed its operative complaint several weeks before AB-5's effective date, and thus it was not

possible for the state to have enforced AB-5 before that date. *See Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 774 (9th Cir. 2006) (explaining that standing is determined "as of the date the complaint was filed"). Nonetheless, in September 2019, before AB-5 became effective and before CTA filed its operative complaint, the state sued Instacart and sought civil penalties based on allegations that Instacart misclassified its workers under *Dynamex*. *See* Complaint, *State v. Maplebear Inc. et al.*, No. 37-2019-00048731-CU-MC-CTL (Cal. Super. Ct. Sept. 13, 2019). Given that AB-5 codified *Dynamex*'s ruling regarding the ABC test, this "history of past enforcement against parties similarly situated to the plaintiffs cuts in favor of a conclusion that a threat is specific and credible." *Lopez v. Candaele*, 630 F.3d 775, 786–87 (9th Cir. 2010).

Because our three-factor test, as applied to the enactment of a new law, establishes that the plaintiffs face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," *Babbitt*, 442 U.S. at 298, we hold that CTA and its members have standing to bring this complaint.

## III

We next consider whether the district court abused its discretion by enjoining the state from enforcing AB-5 against motor carriers doing business in California on the ground that such enforcement is preempted by the F4A.

## A

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the

Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, if a state law "conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). When a federal statute like the F4A contains an express preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* at 664. In focusing on congressional intent, we take into account "the presumption that Congress does not intend to supplant state law, particularly in areas of traditional state regulation." *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1021 (9th Cir. 2020) (cleaned up). "We therefore presume that Congress has not preempted the historic police powers of the States unless that was the clear and manifest purpose of Congress." *Id.* (cleaned up).

We begin with the plain language of the statute. The F4A expressly preempts any state law "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). In interpreting these words, and thus determining the F4A's preemptive scope, we are bound by a long line of precedent that requires us, among other things, to consider "Congress' deregulatory and pre-emption-related objectives" in enacting the F4A. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008). Therefore, we begin by providing the relevant historical and interpretive background.

Before 1978, the trucking and airline industries were extensively regulated. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). In 1978, Congress concluded

that "maximum reliance on competitive market forces" would favor lower airline fares and better airline service, and it enacted the Airline Deregulation Act (ADA). *Id.* (citation omitted). To preclude states from eliminating the benefits of increased competition by imposing their own regulations on the airlines, the ADA included a preemption provision "prohibiting States from enacting or enforcing any law related to rates, routes, or services of any air carrier." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 256 (2013) (citation omitted).

Congress then focused its deregulatory efforts on the trucking industry. It engaged in a two-step process. First, Congress enacted the Motor Carrier Act of 1980 (MCA), which extended federal deregulation to the trucking industry but "explicitly preserved state authority to regulate intrastate trucking." Jill E. Fisch, *How Do Corporations Play Politics?: The Fedex Story*, 58 Vand. L. Rev. 1495, 1528–29 (2005). For this reason, state economic regulation of trucking continued to be a "huge problem for national and regional carriers attempting to conduct a standard way of doing business." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 440 (1994) (citation omitted). For instance, although the ADA preempted state regulation of FedEx's trucking operations because FedEx was organized as an air carrier, *Fed. Exp. Corp. v. Cal. Pub. Utilities Comm'n*, 936 F.2d 1075, 1078–79 (9th Cir. 1991), many of FedEx's competitors, which were organized as motor carriers, did not receive similar protection from state regulation.

In 1994, Congress enacted the F4A, which preempted state authority to regulate intrastate trucking and created a level playing field so that all companies using motor carriers and air carriers received the same protections, regardless of

how they were organized.  *See* H.R. Conf. Rep. No. 103-677, at 87 (1994).  Adopting language from the ADA's preemption clause, the F4A states:  "[A] State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."    49 U.S.C. § 14501(c)(1); *see also id.* § 41713(b)(4)(A) (similar provision for combined motor/air carriers).

Because the F4A uses "text nearly identical" to the ADA's, we have held that analysis of the ADA's preemption clause "is instructive for our FAAAA analysis as well." *Dilts*, 769 F.3d at 644.  There is one difference between the preemption provisions of the ADA and the F4A, however: the latter "contains one conspicuous alteration—the addition of the words 'with respect to the transportation of property,'" a phrase that "massively limits the scope of preemption ordered by the FAAAA" compared to the ADA.  *Dan's City*, 569 U.S. at 261 (cleaned up).[8]  In sum, the state law at issue is preempted to the extent it relates to the price, route, or service of a motor carrier in its operations involving the transportation of property.

B

The interpretation of the words "related to a price, route, or service of any motor carrier" likewise has a long history.

---

[8] The Supreme Court has suggested that this additional limiting language means that the F4A preempts "only laws, regulations, and other provisions that single out for special treatment motor carriers of property." *Ours Garage*, 536 U.S. at 449 (Scalia, J., dissenting) (cleaned up); *see also Dan's City*, 569 U.S. at 261 & n. 4 (agreeing with the *Ours Garage* dissent's characterization of the F4A).

The Supreme Court first interpreted similar language in the ADA's express preemption provision in *Morales v. Trans World Airlines*. *Morales* held that the ADA preempts states from enforcing guidelines related to how airlines may advertise fares. 504 U.S. at 391. *Morales* reached this conclusion because the guidelines established "binding requirements as to how tickets may be marketed." *Id.* at 388. In interpreting "related to," which is the "key phrase" in the preemption provision, *Morales* stated that "the ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with'—and the words thus express a broad pre-emptive purpose." *Id.* at 383 (quoting Black's Law Dictionary 1158 (5th ed. 1979)). For this reason, *Morales* rejected the argument that "only state laws specifically addressed to the airline industry are pre-empted, whereas the ADA imposes no constraints on laws of general applicability." *Id.* at 386. According to the Court, such a construction would create "an utterly irrational loophole" and "ignores the sweep of the 'relating to' language." *Id.* Nevertheless, *Morales* acknowledged that "state actions may affect airline fares in too tenuous, remote, or peripheral a manner to have pre-emptive effect." *Id.* at 390 (cleaned up).

In subsequent cases, the Supreme Court refined its interpretation of "related to." As the Court has explained, "the breadth of the words 'related to' does not mean the sky is the limit." *Dan's City*, 569 U.S. at 260. A court cannot take an uncritically literal reading of "related to," otherwise "for all practical purposes pre-emption would never run its course." *Id.* Perhaps the author of *Morales* said it best: "applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything

else." *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring). Further, the "related to" language "provides an illusory test, unless the Court is willing to decree a degree of pre-emption that no sensible person could have intended—which it is not." *Id.* at 335–36. In this vein, the Supreme Court's decisions about F4A preemption after *Morales* have tended to construe the F4A narrowly, holding, for instance, that a state law is "related to" prices, routes, and services if it "aim[s] directly at the carriage of goods" and requires motor carriers "to offer a system of services that the market does not now provide," or "freeze[s] into place services that carriers might prefer to discontinue in the future." *Rowe*, 552 U.S. at 372, 376.

In light of this guidance, we have attempted to "draw a line between laws that are significantly related to rates, routes, or services, even indirectly, and thus are preempted, and those that have only a tenuous, remote, or peripheral connection to rates, routes, or services, and thus are not preempted." *Dilts*, 769 F.3d at 643 (citation omitted). A law's general applicability, while not dispositive, "will likely influence whether the effect on prices, routes, and services is tenuous or significant." *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 966 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1331 (2019). "What matters is not solely that the law is generally applicable, but where in the chain of a motor carrier's business it is acting to compel a certain result . . . and what result it is compelling." *Id.*

When a generally applicable law compels a motor carrier to a certain result in its relationship with consumers, such as requiring a motor carrier "to offer a system of services that the market does not provide" or that "would freeze into place services that carriers might prefer to discontinue in the

future," and "that the market would not otherwise provide," the law's effect is more likely to be significantly related to rates, routes or services. *Dilts*, 769 F.3d at 645–46 (citation omitted). Such a law may be preempted because it "directly or indirectly, *binds* the carrier to a particular price, route or service and thereby interferes with the competitive market forces within the industry." *Id.* at 646 (citation omitted). Similarly, a state's common law rule may be preempted if it "otherwise regulate[s]" prices, routes, and services by impacting the motor carrier's relationship with its customers. *Miller*, 976 F.3d at 1025 (emphasis omitted) (citing *Dilts*, 769 F.3d at 647). For instance, a negligence claim that seeks to hold a broker (or motor carrier) liable at the point at which it provides a service to its customers is directly (and significantly) related to rates, routes or services, and thus preempted. *Id.* at 1024.

By contrast, laws of general applicability that affect a motor carrier's relationship with its workforce, and compel a certain wage or preclude discrimination in hiring or firing decisions, are not significantly related to rates, routes or services. *See Su*, 903 F.3d at 966. Therefore, enforcement of California's prevailing wage law against motor carriers, the application of California's meal and rest break laws, and "the use of California's common-law test for determining whether a motor carrier has properly classified its drivers as independent contractors" are not preempted, because they impact motor carriers' business at the point where the motor carriers interact with their workers. *Miller*, 976 F.3d at 1023.

A generally applicable law is one that affects individuals "solely in their capacity as members of the general public," *Rowe*, 552 U.S. at 375, and applies "to hundreds of different industries," *Dilts*, 769 F.3d at 647 (citation omitted). When

such generally applicable laws impact motor carriers' relationship with their workforce, they are not "related to a price, route or service" "even if they raise the overall cost of doing business," or "shift[] incentives and make[] it more costly for motor carriers to choose some routes or services relative to others, leading the carriers to reallocate resources or make different business decisions." *Dilts*, 769 F.3d at 646–47 (emphasis omitted); *see also Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1083 (9th Cir. 2020) (holding that a law was not preempted, even if employers had to factor the law "into their decisions about the prices they set, the routes that they use, or the services that they provide, because the law did not "set prices, mandate or prohibit certain routes, or tell motor carriers what services that they may or may not provide, either directly or indirectly" (cleaned up)).

In *Dilts* we applied these principles and determined that California's meal and rest break laws, as applied to motor carriers, are not preempted by the F4A. *See* 769 F.3d at 640. The state laws at issue, which required "a 30-minute meal break for every five hours worked, and a paid 10-minute rest break for every four hours worked," might have increased the costs of doing business, because they might have required motor carriers to hire more drivers, change their current schedules, and make "minor deviations" from their routes. *Id.* at 640, 649 (citations omitted). But because these generally applicable labor laws did not bind motor carriers to specific rates or services, meaningfully interfere with the ability of motor carriers to set routes, or compel a certain result at the level of the motor carriers' consumers rather than their workforce, we determined that the laws were not "related to" prices, routes or services, and thus were not preempted by the F4A. *Id.* at 640; *see also Ridgeway*, 946 F.3d at 1083–86 (holding that the F4A does not preempt a

California minimum-wage law that would require Walmart to pay long-haul-truck-drivers minimum wages for layovers in California).

Four years after *Dilts*, we concluded that the F4A does not preempt the *Borello* test for classifying California workers as either employees or independent contractors. *See Su*, 903 F.3d at 957. We rejected the plaintiff's contentions that application of the *Borello* standard to its workforce bound or compelled it to certain prices, routes, or services. *Id.* at 964–65. Rather, consistent with *Dilts* and *Californians for Safe & Competitive Dump Truck Transportation v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), we held that "[a]t most, carriers will face modest increases in business costs, or will have to take the *Borello* standard and its impact on labor laws into account when arranging operations." *Id.* at 965. The *Borello* test was not preempted by the F4A, we held, because it was "a generally applicable background regulation in an area of traditional state power" that merely affected the relationship "between a carrier and its *workforce*," where "the impact is on the *protections* afforded to that workforce." *Id.* at 961–62. In reaching this conclusion, we rejected the plaintiff's contentions that the *Borello* standard improperly compelled motor carriers to use employees, but we did not decide whether such compulsion would cause a law to be preempted by the F4A. *Id.* at 959 n.4.

Based on *Dilts*, *Su*, and related precedent, a generally applicable state law is not "related to a price, route, or service of any motor carrier" for purposes of the F4A unless the state law "*binds* the carrier to a particular price, route or service" or otherwise freezes them into place or determines them to a significant degree. *Dilts*, 769 F.3d at 646. We have generally held that the state law at issue does not have such a binding

or freezing effect unless it compels a result at the level of the motor carrier's relationship with its customers or consumers. *See id*. at 640, 646; *Su*, 903 F.3d at 966. Such a law does not have a binding or freezing effect, and thus is not preempted, merely because a motor carrier must take the law into account when making business decisions, or merely because the law increases a motor carrier's operating costs. *See Dilts*, 769 F.3d at 646–47.

IV

We now turn to the question whether the F4A preempts the ABC test, as codified in AB-5 and applied to motor carriers. This requires us to determine whether AB-5 is "significantly related to rates, routes, or services . . . and thus [is] preempted," or whether it has "only a tenuous, remote, or peripheral connection to rates, routes, or services" and therefore is not preempted. *Id.* at 643 (cleaned up).

A

We first consider whether AB-5 is generally applicable, because this determination "will likely influence whether the effect on prices, routes, and services is tenuous or significant." *Su*, 903 F.3d at 966. Under our precedent, AB-5 is a generally applicable law because it applies to employers generally; it does not single out motor carriers but instead affects them solely in their capacity as employers. *Cf. Rowe*, 552 U.S. at 375. Even if some businesses are exempt from

AB-5, it certainly applies "to hundreds of different industries."**[9]** *Dilts*, 769 F.3d at 647.

We next consider where in the chain of a motor carrier's business AB-5 is acting to compel a certain result, and the result it is compelling. *Su*, 903 F.3d at 966. AB-5 affects the way motor carriers must classify their workers, and therefore compels a particular result at the level of a motor carrier's relationship with its workforce. It does not compel a result in a motor carrier's relationship with consumers, such as freezing into place a particular price, route or service that a carrier would otherwise not provide. *See Dilts*, 769 F.3d at 646–47. Indeed, CTA does not argue that AB-5 does so. Therefore, it does not have the sort of binding or freezing effect on prices, routes, or services that are preempted under the F4A.

Because AB-5 is a generally applicable law that impacts a motor carrier's business at the point where the motor carrier interacts with its workers, and the law affects motor carriers' relationship with their workers in a manner analogous to the worker classification laws we have previously upheld in *Su*, AB-5 is not significantly related to rates, routes, or services. Therefore, we conclude that the F4A does not preempt AB-5 as applied to motor carriers.

---

**[9]** CTA claims that AB-5 is not generally applicable because it includes a number of exemptions. We disagree. Labor laws typically include exemptions. For instance, the meal-and-rest-break requirements were deemed to be generally applicable in *Dilts*, even though they do not apply to certain categories of workers. *See* Cal. Lab. Code § 512(b)(2)–(f).

B

CTA raises two main arguments in support of its claim that the F4A preempts AB-5.

The first is that AB-5's impact is so significant that it indirectly determines price, routes, or services. According to CTA, the ABC test requires that motor carriers use employees rather than independent contractors as drivers.[10] Given the impact such a requirement has on its members' business models, CTA contends, AB-5 necessarily has a significant effect on prices, routes, and services. In detailing the impact of AB-5 on prices, routes, and services, CTA begins by alleging that AB-5 will increase its members' costs "by as much as 150% or more." According to CTA, motor carriers will have to buy a "fleet of trucks" and maintain and repair those trucks, provide for meal and rest breaks, train employees, set up staff, and provide worker's-compensation insurance. As a result, CTA alleges, its members would pass these increased costs off to customers as increased prices.[11]

---

[10] IBT disputes this claim, and argues that AB-5's business-to-business exemption "permits motor carriers to contract with truly independent owner-operators without necessarily creating an employment relationship." For purposes of determining whether the F4A preempts AB-5, however, we need not address this issue.

[11] Although CTA's allegations of increased costs rely heavily on its claim that motor carriers will be forced to buy a fleet of trucks, CTA conceded that its members could avoid incurring such costs by hiring owner-operators (i.e., drivers who own their own trucks) as employees. Given the undeveloped record in the district court, CTA's allegations with respect to prices, routes, and services are merely speculative.

Moreover, CTA contends that its members would have to "reconfigure and consolidate routes" to offset increased costs. Its members might eliminate certain routes all together and might have to reconfigure routes to ensure their drivers can take meal and rest breaks. All of this would make the routes of CTA's members less efficient.

And finally, CTA contends that the increased labor costs caused by AB-5 would likely put small motor carriers out of business and force other motor carriers to leave California. The remaining motor carriers would therefore offer "diminished services."

We have routinely rejected similar arguments that the F4A preempts California labor laws that impose such indirect effects. *See, e.g.*, *Dilts*, 769 F.3d at 646 (holding that California's meal-and-rest-break laws "are not preempted even if they raise the overall cost of doing business or require a carrier to re-direct or reroute some equipment").

In *Mendonca*, for example, the plaintiffs argued before the district court that California's prevailing wage law would increase motor carriers' costs by 75%, and this increase in costs would increase prices by 25% because wages constituted 33% of the eventual price charged by motor carriers. *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 957 F. Supp. 1121, 1127 & n. 11 (N.D. Cal. 1997). This price increase would, the plaintiffs alleged, require the motor carriers to use independent owner-operators and compel them "to redirect and reroute equipment to compensate for the additional costs imposed on them by the Prevailing Wage Law," and it would "interfere[] with their California segment of operations, which in turn [would disrupt] their interstate services." *Id*. Despite the motor

carriers' dire predictions about increased costs leading to changes in routes and services, we concluded that California's prevailing wage law was not the sort of law that Congress intended to preempt. *Mendonca*, 152 F.3d at 1189. As the district court explained, "if preemption was based on percentages of price, then numerous areas of state regulation would be preempted based solely on their percentage effect on motor carrier prices," contrary to "the Supreme Court's requirement of 'clear and manifest' Congressional intent to preempt." *Mendonca*, 957 F. Supp. at 1127 n.11. We affirmed the district court, holding that the law's effect "is no more than indirect, remote, and tenuous" and did not fall "into the 'field of laws' regulating prices, routes, or services." *Mendonca*, 152 F.3d at 1189; *see also Ridgeway*, 946 F.3d at 1083.

Our decision in *California Trucking Association v. Su* supports this conclusion. In that case, the plaintiff argued that the *Borello* worker-classification test would impact its prices, routes, and services. 903 F.3d at 958. But we held that the test would at most impose "modest increases in business costs" or require motor carriers "to take the *Borello* standard and its impact on labor laws into account when arranging operations." *Id.* at 965. Because the state worker-classification law would not "have an impermissible effect, such as binding motor carriers to specific services, making the continued provision of particular services essential to compliance with the law, or interfering at the point that a carrier provides services to its customers," the law was not preempted. *Id.* The same analysis applies to the impact of AB-5 here.

The dissent argues that we have given insufficient weight to the effect that AB-5 may have on a motor carrier's prices,

routes and services. Dissent at 49–50. According to the dissent, even a generally applicable law that impacts a motor carrier's relationship with its workforce may have such a significant impact on prices, routes and services that it is preempted by the F4A. *See generally* Dissent. While our precedents do not rule out the possibility that a generally applicable law could so significantly impact the employment relationship between motor carriers and their employees that it effectively binds motor carriers to specific prices, routes, or services at the consumer level, the dissent has not identified any case where we have done so. Rather, as noted above, our precedents have consistently considered and rejected predicted effects similar to those raised by CTA. We see no basis for departing from our precedent holding that a law increasing motor carriers' employee costs, but not interfering at the point where the motor carrier provides a service to its customers, does not simply fall "into the field of laws" that Congress intended to preempt. *Mendonca*, 152 F.3d at 1189 (cleaned up).

C

Second, CTA and the dissent argue that because the ABC test requires an employer to hire employees, rather than independent contractors, language in *American Trucking Associations v. City of Los Angeles* and *Su* compels us to conclude that AB-5 is related to the prices, routes, and service of a motor carrier. Again, we disagree.

*American Trucking Associations* involved a challenge to city ordinances requiring that trucks providing drayage services to the Port of Los Angeles and the Port of Long Beach enter into mandatory concession agreements. *See generally* 559 F.3d at 1046. The Ports acknowledged that the

principal purpose of the concession agreements was to reduce truck emissions and address other environmental concerns. *Id.* at 1055. A provision in the Port of Los Angeles's concession agreement required motor carriers operating at the Port of Los Angeles to "transition over the course of five years from independent-contractor drivers to employees." *Id.* at 1049. The district court held that the plaintiff demonstrated a likelihood of success in showing that the agreements were preempted by the F4A, because the agreements "directly regulate[d] the carriers themselves" and might have "force[d] motor carriers to change their prices, routes, or services in a way that the market would not otherwise dictate." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 577 F. Supp. 2d 1110, 1117 (C.D. Cal. 2008), *rev'd*, 559 F.3d at 1046. According to the district court, defendants did "not seem to dispute this," but rather argued that the concession agreements were exempted from preemption because, among other things, the F4A's safety exemption likely applied. *See id.*; *see also* 49 U.S.C. § 14501(a)(2) (providing that the F4A's preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles"). The district court agreed with this rationale and refused to enjoin the implementation of the concession agreements, because there was a significant probability that the concession agreements fell under the safety exception to the F4A. *Am. Trucking Ass'ns*, 577 F. Supp. 2d at 1125.

On appeal, we likewise focused on the F4A's safety exemption. Although we agreed that it "can hardly be doubted" that the concession agreements "relate[d] to prices, routes or services of motor carriers," we noted that the defendants did not "actually dispute that on appeal." *Am. Trucking Ass'ns*, 559 F.3d at 1053; *see also id.* at 1051

(noting that the district court's ruling that the plaintiff could likely demonstrate that the concession agreements "related to a price, route, or service" of motor carriers was "a ruling left unchallenged" on appeal). We reversed the district court on the ground that the concession agreements were aimed at environmental and economic concerns, not safety concerns, and so the concession agreements did not qualify for the safety exemption from preemption. *Id.* at 1056, 1060–61. We remanded so that the district court could determine whether, absent the safety exemption, the "specific terms of each agreement" were likely to be preempted. *Id.*

CTA focuses on our passing statement that it "can hardly be doubted" that the concession agreements "relate to prices, routes or services of motor carriers." *Id.* at 1053. According to CTA, this language compels us to hold that AB-5 is preempted. This argument fails. We did not have occasion in *American Trucking Associations* to address the question whether or how the concession agreements related to the motor carrier's prices, routes, or services, because that issue was not on appeal. Moreover, any determination that the concession agreements did "relate to prices, routes or services of motor carriers" would not be controlling here, because *American Trucking Associations* did not involve a generally applicable law, but rather a targeted agreement that "directly regulate[d] the carriers themselves." *Am. Trucking Ass'ns*, 577 F. Supp. 2d at 1117. As we have since explained, "Congress did not intend to preempt generally applicable state transportation, safety, welfare, or business rules that do not otherwise regulate prices, routes, or services." *Dilts*, 769 F.3d at 644. Accordingly, our dicta in *American Trucking Associations*, which was "made casually and without analysis, uttered in passing without due consideration of the alternatives, [and] done as a prelude to another legal

issue that command[ed] the panel's full attention," *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (cleaned up), does not control our analysis here.

CTA also argues that our discussion of *American Trucking Associations* in *Su* compels the conclusion that a state law that requires a motor carrier to employ only independent contractors must be deemed to relate to the prices, routes, and services or motor carriers for purposes of F4A preemption. For several reasons, we do not read *Su* as going that far.

CTA relies on a portion of *Su* discussing the plaintiff's claim that the *Borello* test imposed an "improper compulsion" of the sort preempted by the F4A, because it compelled the use of independent contractors. 903 F.3d at 964. *Su* rejected that argument. Rather than determine whether such compulsion is preempted by the F4A, however, *Su* instead concluded that the *Borello* test "does not, by its terms, compel a carrier to use an employee or an independent contractor." *Id.* Distinguishing *American Trucking Associations*, we stated that the case "stands for the obvious proposition that an 'all or nothing' rule requiring services be performed by certain types of employee drivers and motivated by a State's own efficiency and environmental goals was likely preempted." *Id.*

Despite our passing characterization of *American Trucking Associations*, we recognized that the question whether the F4A preempted a labor law like the ABC test was not before us, and we expressly left that question open: after recognizing that *Dynamex* had adopted the ABC test while the appeal in *Su* was pending, we clarified that "we need not and do not decide whether the FAAAA would preempt using

the 'ABC' test to enforce labor protections under California law." *Id.* at 964 n.4, 964 n.9. Because *Su* "did not make a deliberate decision to adopt" a rule regarding the ABC test—and indeed expressly disclaimed doing so—we are neither bound nor meaningfully assisted for analytical purposes by its statements made without reasoned consideration. *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 953 (9th Cir. 2008). Given that the issue was not on appeal, it is not surprising that *Su* provided no reasoning as to why a state law requiring the use of employees would necessarily be "related to" the prices, routes, or services of motor carriers. Indeed, *Su* itself acknowledged that "Congress did not intend to hinder States from imposing normative policies on motor carriers as employers." *Id.* at 963. Rather, *Su*'s statement was solely based on its erroneous characterization of *American Trucking Associations* as deciding that the F4A likely preempted an "all or nothing" rule requiring employee drivers. As explained above, however, this issue was not even on appeal in that case. We are therefore not constrained or materially instructed by *Su*'s passing discussion of the ABC test. *Schweitzer*, 523 F.3d at 953.

Finally, the dissent argues that *Miller* supports CTA's position. Dissent at 44. We disagree. *Miller* held that a common-law negligence cause of action, not a generally applicable labor law, was preempted by the F4A. *See* 976 F.3d at 1023–24. In reaching this conclusion, *Miller* reaffirmed that the F4A does not prohibit California from enforcing normal background rules applying to employers doing business in California, which are not "related to" carrier prices, routes, or services. *Id.* Rather, *Miller* held that common law negligence was distinguishable from laws governing employment relations, because negligence claims

sought to hold a company "liable at the point at which it provides a 'service' to its customers," which is "directly connected with" services "in a manner that was lacking in *Mendonca*, *Dilts,* and *Su*." *Id.* at 1024 (cleaned up). Here, of course, AB-5 is a generally applicable statutory labor law that affects motor carriers' business at the level of the carriers' workforce, not their consumers. Thus, *Mendonca*, *Dilts*, and *Su* control, and *Miller* does not.[12]

D

We likewise reject the arguments made by CTA and the dissent based on *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 437–40 (1st Cir. 2016) and *Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 816 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 102 (2019). The language relied upon is contrary to our precedent.

In *Schwann*, the First Circuit determined that Prong 2 of Massachusetts' ABC test (which is identical to Prong B of the California ABC test codified in AB-5) sufficiently relates to a motor carrier's services and routes, because interfering with the employer's decision whether to use an employee or an independent contractor could prevent a motor carrier from using its preferred methods of providing delivery services, raise the motor carrier's costs, and impact routes. *Schwann*, 813 F.3d at 438–39; *see also Bedoya*, 914 F.3d at 824–25

---

[12] The dissent claims that AB-5 is "like the common law of negligence at issue in *Miller* and unlike the employment regulations at issue in *Mendonca*, *Dilts*, and *Su*." Dissent at 44. Because AB-5 is a generally applicable law governing employment, closely analogous to the worker-classification test in *Su*, and does not impose liability for negligence, we are puzzled by this argument.

(opining in dicta that the F4A preempts Massachusetts' ABC test because it "mandate[s] a particular course of action—e.g., requiring carriers to use employees rather than independent contractors"). But we have previously concluded that such indirect consequences have "only a tenuous, remote, or peripheral connection to rates, routes or services." *Dilts*, 769 F.3d at 643 (cleaned up).[13]

In light of our case law, we also reject CTA's argument that the legislative history of the F4A supports holding that the F4A preempts AB-5. In *Su*, we found "nothing in the FAAAA's legislative history indicat[ing] that Congress intended to preempt the traditional power to protect employees or the necessary precursor to that power, i.e., identifying who is protected." 903 F.3d at 967. This further supported our conclusion that "Congress did not intend to foreclose States from applying common law tests to discern who is entitled to generally applicable labor protections." *Id*. CTA argues that a passage in a 1994 House report makes clear that Congress intended for the F4A to preempt state laws that discriminated against motor carriers whose business model was based on hiring owner-operators. H.R. Conf. Rep. No. 103-677, at 87 (1994). We disagree. The House report

---

[13] CTA also relies on two state-court opinions holding that Prong B of the ABC test is preempted by the F4A. *See People ex rel. Harris v. Pac Anchor Transp., Inc.*, 59 Cal. 4th 772, 783 (2014); *People v. Cal Cartage Transp. Express, LLC*, 2020 WL 497132, at *1 (Cal. Super. Ct. Jan. 8, 2020), *vacated by People v. Superior Ct. of L.A. Cnty.*, 271 Cal. Rptr. 3d 570, 582 (Ct. App. 2020). But we are bound by our precedent, not contrary state-court rulings. Moreover, two California Courts of Appeal recently held that the F4A *does not* preempt AB-5 as applied to motor carriers. *See Superior Ct. of L.A. Cnty*, 271 Cal. Rptr. 3d at 582; *Parada v. E. Coast Transp. Inc.*, No. B296566, 2021 WL 1222007 (Cal. Ct. App. Mar. 26, 2021).

states that "[t]he need for [preemption] has arisen from this patchwork of regulation and in a June 25, 1991 9th Circuit Court of Appeals decision . . . ." *Id.* The Ninth Circuit opinion at issue had held that the ADA preempted state regulation of FedEx, which was organized as an air carrier, even though it did not preempt state regulation of companies engaged in similar operations that were organized as motor carriers. *Fed. Exp. Corp.*, 936 F.2d at 1078–79. While one of Congress's purposes may have been to level the playing field for motor carriers like FedEx's competitors, the House report does not indicate any intent to allow motor carriers full discretion in how they classified their workforce.[14]

Because AB-5 is a generally applicable labor law that impacts the relationship between a motor carrier and its workforce, and does not bind, compel, or otherwise freeze into place a particular price, route, or service of a motor

---

[14] The dissent claims that our holding "undermines the balance of state and federal power contemplated by the F4A." Dissent at 53. The dissent gets it backward. We begin with the presumption that Congress did not intend to preempt a law that is within a state's historical police powers, unless that "was the clear and manifest purpose of Congress." *Miller*, 976 F.3d at 1021. It is the dissent that would tip the balance of power against the states and in favor of the federal government by holding that federal law preempts AB-5, a state law clearly within an area of traditional state power, without citing any evidence that Congress clearly and expressly intended to do so. The dissent relies on *Rowe* to support its claim that Congress intended to preempt laws like AB-5, but this reliance is misplaced. In *Rowe*, the regulation at issue required, among other things, that a driver delivering tobacco products verify the identity and age of the recipient of the package, and obtain the recipient's signature. 552 U.S. at 369. Such a law is clearly the sort of "service-determining law" that Congress intended to preempt. *See id*. at 373. By contrast, AB-5 does not mandate that motor carriers provide or withhold any service.

carrier at the level of its customers, it is not preempted by the F4A.  Because CTA is unlikely to succeed on the merits, the district court erred by enjoining the state from enforcing AB-5 against motor carriers operating in California.  *Winter*, 555 U.S. at 20.  By failing to follow our precedent regarding labor laws of general applicability, the district court committed a legal error to which we cannot defer, even at the preliminary-injunction stage.  *See Arpaio*, 821 F.3d at 1103.[15]

**REVERSED.**

BENNETT, Circuit Judge, dissenting:

I agree with the majority that for purposes of F4A preemption, we "draw a line between laws that are significantly related to rates, routes, or services, even indirectly, and thus are preempted, and those that have only a tenuous, remote, or peripheral connection to rates, routes, or services, and thus are not preempted."  Majority Opinion at 22 (quoting *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 643 (9th Cir. 2014)).  I also agree that "laws of general applicability that affect a motor carrier's relationship with its workforce . . . are not significantly related to rates, routes or services," Majority Opinion at 23—*if* those laws significantly affect *only* a motor carrier's relationship with its workforce. I do not agree, however, that a law like AB-5—which affects motor carriers' relationships with their workers *and* significantly impacts the services motor carriers are able to provide to their customers—is not related to motor carriers'

---

[15] Because the F4A does not preempt AB-5 as applied to motor carriers, we do not address the remaining preliminary-injunction factors.

services and thus is not preempted.[1]    Therefore, I respectfully dissent.

We review the grant of a preliminary injunction for abuse of discretion. *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). "Our review is limited and deferential, and we do not review the underlying merits of the case." *Id.* (quotation marks, citation, and alteration omitted). There are four factors we must consider: (1) the likelihood of success on the merits, (2) the likelihood of irreparable harm, (3) the balance of equities, and (4) the public interest. *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018). The majority reverses the district court under the first prong, concluding that CTA is "unlikely to succeed" in proving that AB-5 is preempted. Majority Opinion at 39.

"[T]he [F4A's] central objective is to avoid frustrating the statute's deregulatory purpose by preventing states from imposing a patchwork of state service-determining laws." *Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 818 (3d Cir. 2019) (quotation marks and citation omitted). Thus, the F4A preempts any state law that is "related to" a motor carrier's prices, routes, or services. 49 U.S.C. § 14501(c)(1). While the Supreme Court has instructed that "the breadth of the words 'related to' does not mean the sky is the limit," *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013), it has also made clear that the words "express a broad pre-emptive purpose," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). Accordingly, the Supreme Court held in *Morales* that a state law is not "related" for preemption purposes if its impact is "too tenuous, remote, or

---

[1] I agree with the majority that amendments to AB-5 and the passage of Proposition 22 do not affect our analysis. Majority Opinion at 11 n.5.

peripheral." *Id.* at 390 (citation omitted). But *Morales* also made clear that "pre-emption occurs *at least* where state laws have a 'significant impact'"—specifically on prices, routes, or services in the context of the F4A. *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008) (emphasis added) (quoting *Morales*, 504 U.S. at 390). This rule applies both to laws that target motor carriers and to laws of general applicability. *See Morales*, 504 U.S. at 386. Consistent with Supreme Court precedent, then, the straightforward question we should have answered today is whether AB-5's impact on CTA members' prices, routes, or services is significant or instead merely tenuous, remote, or peripheral.

Applying this critical distinction, our court has repeatedly held that state employment laws with a significant impact on motor carriers' relationships to their workforces, but only a tenuous, remote, and peripheral effect on their prices, routes, and services, are not preempted by the F4A. In *Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), we considered California's Prevailing Wage Law that required contractors who were awarded public works contracts to pay their workers "not less than the general prevailing rate." *Id.* at 1186. The motor carriers argued that the law was "related to" prices, routes, and services because, among other things, it forced them to increase prices and redirect and reroute equipment to compensate for lost revenue. *Id.* at 1189. We held that the law was not "related to" the carriers' prices, routes, or services because it did not "*acutely* interfer[e]" with them. *Id.*

In *Dilts*, we considered California labor laws requiring "a 30-minute meal break for every five hours worked, and a paid

10-minute rest break for every four hours worked."  769 F.3d at 640 (citation omitted).  We held that the laws were not preempted because they "[did] not bind motor carriers to specific prices, routes, or services," would cause "nothing more than a *modestly* increased cost of doing business" and "*minor* deviations" in drivers' routes, and would not "*meaningfully* decrease the availability of routes to motor carriers." *Id.* at 647–49 (emphasis added) (quotation marks and citation omitted).  In accord with *Morales*, we reaffirmed that "state laws like California's, which do not directly regulate prices, routes, or services, are not preempted by the [F4A] unless they have a 'significant effect' on prices, routes, or services." *Id.* at 649–50.  Thus, because "there [was] no showing of an actual or likely significant effect on prices, routes, or services," we concluded that "the California laws at issue [were] not preempted." *Id.* at 650.

Finally, in *California Trucking Association v. Su*, 903 F.3d 953 (9th Cir. 2018), we considered the *Borello* test, which used to be California's common law test for determining whether someone was an employee or independent contractor. *Id.* at 957.  The *Borello* test was essentially a totality of the circumstances balancing analysis: there were eight to ten factors, and no factor was dispositive. *See S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 769 P.2d 399, 407 (Cal. 1989).  We held that the *Borello* test was not preempted by the F4A because "[a]t most, carriers [would] face *modest* increases in business costs, or [would] have to take the *Borello* standard and its impact on labor laws *into account* when arranging operations." *Su*, 903 F.3d at 965 (emphasis added).  Such impacts were "not significant, and so [did] not warrant preemption." *Id.* at 964.

Out of these cases, the majority crafts the general rule that "laws of general applicability that affect a motor carrier's relationship with its workforce . . . are not significantly related to rates, routes or services." Majority Opinion at 23. But the majority's rule ignores the possibility that a state law might affect a motor carrier's relationship with its workforce *and* have a significant impact on that motor carrier's prices, routes, or services, which would mandate F4A preemption under Supreme Court precedent. *See Rowe*, 552 U.S. at 371 ("[P]re-emption occurs *at least* where state laws have a significant impact [on prices, routes, or services]." (emphasis added) (quotation marks and citation omitted)).

Our prior F4A preemption decisions did not overlook this point. In *Mendonca*, we stated that "state regulation in an area of traditional state power *having no more than an indirect, remote, or tenuous effect on a motor carrier*['*s*] *prices, routes, and services* [is] not preempted"—not that *any* regulation in an area of traditional state power, such as employment, is not preempted. 152 F.3d at 1188 (emphasis added). In *Dilts*, we similarly stated that in enacting the F4A, "Congress did not intend to preempt generally applicable state transportation, safety, welfare, or business rules *that do not otherwise regulate prices, routes, or services*." 769 F.3d at 644 (emphasis added). And in *Su*, we stated that "Congress did not intend to preempt laws that implement California's traditional labor protection powers, *and which affect carriers' rates, routes, or services in only tenuous ways*." 903 F.3d at 961 (emphasis added). We clarified that "[w]hat matters is . . . where in the chain of a motor carrier's business it is acting to compel a certain result . . . *and what result it is compelling*." *Id.* at 966. We thus held that the *Borello* test was not preempted precisely "because the *Borello* standard [did] not compel the use of employees or

independent contractors; instead, at most, it impact[ed motor carriers] in ways that . . . [were] not significant." *Id.* at 964.

Despite that holding, the majority mischaracterizes dicta in *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016 (9th Cir. 2020), as reaffirming that "the F4A does not prohibit California from enforcing normal background rules applying to employers doing business in California." Majority Opinion at 35. But *Miller* did not embrace such a categorical rule, which would have been at odds with *Morales*. Instead, *Miller* reaffirmed that "[t]he phrase 'related to' in the [F4A] embraces state laws having a connection with or reference to . . . rates, routes, or services, whether directly or indirectly." 976 F.3d at 1022 (ellipsis in original) (quotation marks and citation omitted). *Miller* then held that when a generally applicable state law "seeks to hold [a motor carrier] liable at the point at which it provides a 'service' to its customers," the state law is "directly connected with" a motor carrier's service (and thus preempted) "in a manner that was lacking in *Mendonca*, *Dilts*, and *Su*." *Id.* at 1024 (quotation marks, citation, and alteration omitted).

AB-5 seeks to interfere with motor carriers' operations at the point at which they provide a service to their customers, like the common law of negligence at issue in *Miller* and unlike the employment regulations at issue in *Mendonca*, *Dilts*, and *Su*. Whereas the wage law in *Mendonca* did not *require* motor carriers to raise their prices, the meal and rest break laws in *Dilts* caused only "*modestly* increased cost[s]" and "*minor* deviations" in routes, and the *Borello* test "[did] not *compel* the use of employees or independent contractors," AB-5 mandates the very means by which CTA members must provide transportation services to their customers. It requires them to use employees rather than independent contractors as

drivers, thereby significantly impacting CTA members' relationships with their workers *and* the services that CTA members are able to provide to their customers.

AB-5's ABC test includes three factors. If the employer fails to establish all three, then the worker "*shall be considered an employee* rather than an independent contractor." Cal. Lab. Code § 2750.3(a)(1) (emphasis added). The factor at issue is B: whether the worker "performs work that is outside the usual course of the hiring entity's business." *Id.* § 2750.3(a)(1)(B). The district court found that under B, "drivers who may own and operate their own rigs will *never* be considered independent contractors under California law."[2] *Cal. Trucking Ass'n v. Becerra*, 433 F. Supp. 3d 1154, 1165 (S.D. Cal. 2020). And this is self-evident: independent-contractor truckers hauling goods for the hiring entity are perforce *not* performing work outside the usual course of the hiring entity's business, which is, of course, hauling goods. Thus, as the district court correctly found, motor carriers would have to "reclassify all independent-contractor drivers as employee-drivers for all purposes under the California Labor Code, the Industrial Welfare Commission [(IWC)] wage orders, and the Unemployment Insurance Code." *Id.* at 1166.

The appellants do not present any arguments to the contrary. In fact, the district court "repeatedly invited [the

---

[2] As discussed below, this court made the same point in even stronger terms in *Su*: "[T]he 'ABC' test may effectively *compel* a motor carrier to use employees for certain services because, under the 'ABC' test, a worker providing a service within an employer's usual course of business will never be considered an independent contractor." 903 F.3d at 964 (emphasis added).

state] to explain how the ABC test was not an 'all or nothing test'"—specifically "how a motor carrier could contract with an independent owner-operator as an independent contractor, rather than as an employee"—and neither the State Defendants nor Intervenor-Appellant International Brotherhood of Teamsters did so. *Id.* at 1165 n.9. These same parties were just as stumped when asked the same question during oral argument. Though they insisted that we were asking the wrong question, they did not dispute that the ABC test would automatically characterize as employees all those with whom CTA members contracted to haul goods.

In the absence of any dispute that AB-5 will "categorically prevent[] motor carriers from exercising their freedom to choose between using independent contractors or employees," *id.* at 1165, the obvious conclusion is that AB-5 *will* significantly impact motor carriers' services by mandating the means by which they are provided. At the very least, the district court did not abuse its discretion in so concluding, especially given that the differences between transportation services provided by independent contractor drivers and those provided by employee drivers are neither superficial nor "peripheral." *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 438 (1st Cir. 2016). Whether to provide a service directly through employees or indirectly through independent contractors "is a significant decision in designing and running a business. . . . [T]hat decision implicates the way in which a company chooses to allocate its resources and incentivize those persons providing the service." *Id.*

First, the record demonstrates that in addition to altering motor carriers' relationships to their workers, AB-5 will significantly impact motor carriers' services to their

customers by diminishing the specialized transportation services that motor carriers are able to provide through independent contractor drivers.  As the declaration of Greg Stefflre, an officer of one of CTA's members, explains in great detail:

> Many individual owner-operators have invested in specialized equipment and have obtained the skills to operate that equipment efficiently.  Some of these owner-operators have unique and expensive equipment not available in the fleet of other trucking companies.  Therefore, an owner-operator fleet by definition consists of a variety of specialists who can bring on their specialized equipment as needed and, when the need abates, the owner-operator can move to another motor carrier where the equipment is needed.  In contrast, employee fleets cannot keep infrequently used, specialized equipment on hand because of the capital costs associated with acquiring this equipment.  As a result, employee-based motor carriers will be unable to offer services requiring such equipment—services currently available through owner-operator based motor carriers.

Dist. Ct. Dkt. No. 54-2 at 8.  This lack of specialization will deprive motor carriers' *consumers* of particular services—consumers who depend on motor carriers to hire independent contractors to transport unwieldy, hazardous, or otherwise unusual goods that could not be transported with typical trucks and equipment.

Second, the record also demonstrates that by requiring motor carriers to hire employee drivers, AB-5 will eliminate motor carriers' flexibility to accommodate fluctuations in supply and demand, given that California's IWC Wage Order No. 4-2001(9)(B) requires employers to supply their employees' tools and equipment. Stefflre's declaration also elaborates on this predictable outcome:

> The use of owner-operators permits expansion in times of plenty and contraction during shortages in business. Employee driver fleets cannot expand and contract as easily and certainly not as inexpensively as independent contractor fleets. To use employee drivers, one needs to acquire trucks. Even if leased, such leases require fixed terms when establishing price so the size of the fleet cannot be lowered without incurring penalties. In owned fleets, the unused tractors become a completely non-productive asset and a drain on profitability. Owner-operator fleets can relatively easily expand and contract. When existing business goes to a competitor, the owner-operators working with the incumbent simply move to the successful bidder eliminating the drain that would occur with an employee fleet.

Dist. Ct. Dkt. No. 54-2 at 7–8. Thus, as further explained by the declaration of Shawn Yadon, the CEO of CTA, hiring only employee drivers will limit motor carriers to "obtaining just enough equipment and employee drivers to meet the typical demand," so that they "[can]not provide additional resources to provide truck services during times of peak

demand." Dist. Ct. Dkt. No. 54-3 at 6. Again, this inability to meet temporary rises in demand will deprive motor carriers' *consumers* of particular services—consumers such as farmers and retail sellers who depend on motor carriers to seasonally hire independent contractors during harvests and peak retail seasons, respectively. Dist. Ct. Dkt. No. 54-3 at 6; Dist. Ct. Dkt. No. 54-5, Ex. B at 12.

The majority mischaracterizes my argument as suggesting "that AB-5's impact is so significant that it indirectly *determines* . . . services," Majority Opinion at 28 (emphasis added), an argument that the majority then brushes aside because "[w]e have routinely rejected similar arguments that the F4A preempts California labor laws that impose such indirect effects," Majority Opinion at 29. However, rather than suggesting that AB-5 determines services, I argue that AB-5 determines the *means* of providing said services, thereby significantly impacting them—which is enough to trigger F4A preemption. *Cf. Miller*, 976 F.3d at 1024–25 ("We have occasionally suggested that preemption occurs only when a state law [binds motor carriers to specific prices, routes, or services]. . . . But even these cases acknowledged that the scope of [F4A] preemption is broader than this language suggests."). Furthermore, although "[w]e have routinely rejected" arguments that the F4A preempts California labor laws that indirectly affect prices, routes, or services—by raising wages, requiring brief meal and rest breaks, or causing motor carriers to take "into account" state standards for labeling workers as independent contractors—these arguments are not "similar" to my argument that an "all or nothing" rule mandating the very means by which a motor carrier can provide its services is preempted. My argument is more akin to the Supreme Court's holding in *Rowe*, that a state law has a significant

impact on services not only when it determines said services, but also when it regulates "the essential details of a motor carrier's system for picking up, sorting, and carrying goods—essential details of the carriage itself." *Rowe*, 552 U.S. at 373.

The majority concedes that "our precedents do not rule out the possibility that a generally applicable law could so significantly impact the employment relationship between motor carriers and their employees that it effectively binds motor carriers to specific prices, routes, or services at the consumer level." Majority Opinion at 31. In fact, this court has twice endorsed my position that "all or nothing" rules requiring the use of employee rather than independent contractor drivers are preempted by the F4A. In *American Trucking Associations v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), we considered a city-imposed concession agreement requiring that motor carriers transition from using independent contractors to employees in order to operate at the Port of Los Angeles. *Id.* at 1049. We made clear at the outset: "That the Concession agreements relate to prices, routes or services of motor carriers can *hardly be doubted*. Thus, we fully agree with the district court that it is likely that ATA will establish that proposition." *Id.* at 1053 (emphasis added). The district court had concluded that preemption was likely because the "concession agreements [would possibly] force motor carriers to change their prices, routes, or services in a way that the market would not otherwise dictate." *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 577 F. Supp. 2d 1110, 1117 (C.D. Cal. 2008).

In *Su*, we considered the ABC test at issue here, as a counterpoint to *Borello*'s totality of the circumstances test. We began by characterizing *American Trucking Associations*

as "stand[ing] for the obvious proposition that an 'all or nothing' rule requiring services be performed by certain types of employee drivers . . . was likely preempted." 903 F.3d at 964. We then explained: "Like *American Trucking*, the 'ABC' test may effectively compel a motor carrier to use employees for certain services because, under the 'ABC' test, a worker providing a service within an employer's usual course of business will never be considered an independent contractor." *Id.*

Two other circuits have also held or signaled that all or nothing rules like California's ABC test are or should be preempted. In *Schwann*, the First Circuit held that the F4A preempts Prong 2 of Massachusetts's 1-2-3 test.[3] *See* 813 F.3d at 442. The First Circuit recognized the obvious reality that "Prong 2 would *significantly* affect how [motor carriers] provide[] good and efficient service" by "*mandat*[*ing*] that [motor carriers] classify . . . individual contractors as employees," thereby "*significant*[*ly*] *impact*[*ing*] . . . the actual routes followed for the pick-up and delivery of packages." *Id.* at 439 (emphasis added). The court held that such "regulatory interference" would not be "peripheral." *Id.* at 438. Rather, "[s]uch an application of state law [would] pose[] a serious potential impediment to the achievement of the [F4A's] objectives because a court, rather than the market participant, would ultimately determine what services that company provides and how it chooses to provide them." *Id.*

---

[3] The only difference between the 1-2-3 test and the ABC test is the name—all three prongs are identical. *Compare* Mass. Gen. Laws ch. 149, § 148B(a), *with* Cal. Lab. Code § 2750.3(a)(1).

In *Bedoya*, the Third Circuit upheld New Jersey's ABC test against an F4A preemption defense. 914 F.3d at 824. New Jersey's test is identical to California's and Massachusetts's tests with one key difference: the New Jersey test does not "categorically prevent[] carriers from using independent contractors" because its Prong B includes an "alternative method for reaching independent contractor status . . . by demonstrating that the worker provides services outside of the putative employer's places of business." *Id.*; *see id.* at 816–17. The Third Circuit thus held that New Jersey's ABC test was not preempted because it "[did] not have a significant effect on prices, routes, or services," "[did] not bind [motor carriers] to a particular method of providing services," and "[did] not mandate a particular course of action"—"*unlike the preempted Massachusetts law at issue in* Schwann." *Id.* at 824–25 (emphasis added).

The majority brushes all of these cases aside: "We did not have occasion in *American Trucking Associations* to address the question whether the concession agreements related to the motor carrier's prices, routes, or services, because that issue was not on appeal." Majority Opinion at 33. And "[b]ecause *Su* did not make a deliberate decision to adopt a rule regarding the ABC test—and indeed expressly disclaimed doing so—we are neither bound nor meaningfully assisted for analytical purposes by its statements made without reasoned consideration." Majority Opinion at 35 (quotation marks and citation omitted). As for *Schwann* and *Bedoya*, the majority claims that they are "contrary to our precedent," citing *Dilts*. Majority Opinion at 36. But *Dilts* did not address an "all or nothing rule" like California's ABC test, and even if the majority is correct as to the cases' precedential value, the majority understates or ignores each case's persuasive value. I agree that it can "hardly be doubted" that an "all or nothing"

rule requiring motor carriers to hire employees rather than independent contractors relates to motor carriers' services and is thus preempted. No one—not even the majority—argues that AB-5 will not compel motor carriers to use employees rather than independent contractors.

The majority's holding undermines the balance of state and federal power contemplated by the F4A and in doing so, unnecessarily creates a circuit split.[4] AB-5 is preempted as

---

[4] The majority charges that I "would tip the balance of power against the states and in favor of the federal government by holding that federal law preempts AB-5, a state law clearly within an area of traditional state power, without citing any evidence that Congress clearly and expressly intended to do so." Majority Opinion at 38 n.14 (citing *Miller*, 976 F.3d at 1021). However, in *Rowe*, the Supreme Court held that "state service-determining laws" are "inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." 552 U.S. at 373. The Court reiterated in *Dan's City* that the "target at which [the F4A] aimed was a State's direct substitution of its own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide." 569 U.S. at 263. As already explained with the support of record evidence, AB-5 will determine the services that motor carriers are able to provide to their customers. Therefore, it is not my dissent, but rather AB-5 and the majority's decision to uphold it that conflict with the balance of state and federal power mandated by the F4A. The majority attempts to distinguish this case from *Rowe* with the conclusory statement that the law at issue was "clearly the sort of 'service-determining law' that Congress intended to preempt," whereas "AB-5 does not mandate that motor carriers . . . withhold any service." Majority Opinion at 38 n.14. The majority seems to forget its own acknowledgment only two sentences prior that the law at issue in *Rowe* also did not mandate that motor carriers withhold any service, but instead "required, among other things, that a driver delivering tobacco products verify the identity and age of the recipient of the package, and obtain the recipient's signature." Majority Opinion at 38 n.14. In other words, the law at issue in *Rowe* was a "service-determining law" preempted by the

applied to CTA's members, a conclusion compelled by binding precedent from the Supreme Court and our circuit. That ends the inquiry. But even were the question close (and it isn't), we would have no basis for reversing here, given the standard of review and given that the majority does not even try to suggest that the district court abused its discretion in finding that the other injunction factors—irreparable harm,[5] balance of the equities, and the public interest[6]—favor the plaintiff.

The majority concludes that "[b]y failing to follow our precedent regarding labor laws of general applicability, the district court committed a legal error to which we cannot defer, even at the preliminary-injunction stage." Majority Opinion at 39. But as I have shown, none of the cases on which the majority relies dealt with a law like AB-5, which

---

F4A because it regulated "the essential details of a motor carrier's system for picking up, sorting, and carrying goods," 552 U.S. at 373—exactly the same as AB-5.

[5] "Plaintiffs have shown that irreparable harm is likely because without significantly transforming their business operations to treat independent-contractor drivers as employees for all specified purposes under California laws and regulations, they face the risk of governmental enforcement actions, as well as criminal and civil penalties." *Cal. Trucking*, 433 F. Supp. 3d at 1169.

[6] "The Court recognizes the Legislature's public interest in protecting misclassified workers, which it attempted to further address with AB-5. That public interest, however, 'must be balanced against the public interest represented in Congress's decision to deregulate the motor carrier industry, and the Constitution's declaration that federal law is to be supreme.' *American Trucking Associations*, 559 F.3d at 1059–60. Therefore, the public interest tips sharply in Plaintiffs' favor." *Cal. Trucking*, 433 F. Supp. 3d at 1171.

affects motor carriers' relationships with their workers *and* significantly impacts their services. In the absence of directly applicable precedent, I do not see how the district court could have abused its discretion after thoroughly analyzing our F4A precedent and applying the exact standard the majority adopts to the facts of this case.[7] *See Am. Trucking*, 559 F.3d at 1052

---

[7] The district court and the majority agree as to the *law* governing this case. Like the majority, the district court described the applicable legal standard as follows: "Congress did not intend to preempt laws that implement California's traditional labor protection powers, and which affect carriers' rates, routes, or services in only *tenuous* ways. Still, where a state law significantly impacts a carrier's prices, routes, or services, it is forbidden." *Cal. Trucking*, 433 F. Supp. 3d at 1163–64 (quotation marks and citations omitted). *Cf.* Majority Opinion at 22 ("[W]e have attempted to draw a line between laws that are significantly related to rates, routes, or services, even indirectly, and thus are preempted, and those that have only a tenuous, remote, or peripheral connection to rates, routes, or services, and thus are not preempted." (quotation marks and citation omitted)). The district court and the majority disagree only as to the *application* of that law to the *facts* of this case. Whereas the majority believes that "AB-5 is a generally applicable labor law that impacts [only] the relationship between a motor carrier and its workforce, and does not bind, compel, or otherwise freeze into place a particular price, route, or service of a motor carrier at the level of its customers," Majority Opinion at 38–39, the district court reached the opposite conclusion: "Plaintiffs have shown the ABC test is . . . likely preempted by the [F4A] because it compels a certain result—by compelling a motor carrier to use employees for certain services." *Cal. Trucking*, 433 F. Supp. 3d at 1168 (quotation marks, citation, and alteration omitted). The district court elaborated that unlike *Mendonca*, *Dilts*, and *Su*, the facts of this case show that AB-5 will significantly impact not only motor carriers' relationships to their workers, but also their prices, routes, or services:

> [T]he present case concerns the test used to *classify* workers for the purpose of determining whether *all* of California employment laws do or do not apply, rather than a small group of those laws, such as the meal break regulations in *Dilts*. Thus, the combined effect of

("As long as the district court got the law right, [its preliminary injunction] will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." (citation and alteration omitted)).  The majority's holding that the district court abused its discretion is especially perplexing given the abundance of opinions by our court and sister circuits holding or strongly suggesting that the F4A preempts "all or nothing" rules like the AB-5, and given the majority's own concession that "our precedents do not rule out the possibility that a generally applicable law could so significantly impact the employment relationship between motor carriers and their employees that it effectively binds motor carriers to specific prices, routes, or services at the consumer level," Majority Opinion at 31.

Nonetheless, California will now be free to enforce its preempted law.  CTA's members will now suffer irreparable injury.  And the damage to the policies mandated by Congress will likely be profound.  Thus, I respectfully dissent.

---

all such laws has a significant impact on motor carriers' prices, routes, or services.  Accordingly, *Dilts* and other similar cases are distinguishable because they focus on whether discrete wage-and-hour laws and regulations had more than a tenuous impact on motor carriers' prices, routes, or services, not whether the combined impact of applying all of California's employment laws to independent owner-operators had more than a tenuous impact on motor carries' prices, routes, or services.

*Id.* at 1168–69.