**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF ARIZONA,
*Plaintiff-Appellant*,

v.

JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of Treasury; UNITED STATES DEPARTMENT OF THE TREASURY,
*Defendants-Appellees.*

No. 21-16227

D.C. No.
2:21-cv-00514-DJH

OPINION

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted January 13, 2022
San Francisco, California

Filed May 19, 2022

Before: Ronald M. Gould, Mark J. Bennett, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge R. Nelson

# SUMMARY[*]

## Standing

The panel reversed the district court's dismissal for lack of subject matter jurisdiction of an action brought by the State of Arizona against federal defendants alleging that the American Rescue Plan Act ("ARPA") violated the Constitution's Spending Clause and the Tenth Amendment.

Congress passed ARPA to help state, local, and tribal governments mitigate the ongoing effects of the COVID-19 pandemic. The statute contains a provision (the "Offset Provision") – challenged in this appeal – prohibiting a State from using ARPA funds to subsidize a tax cut or otherwise a reduction in state net tax revenue. Specifically, Arizona contends that it was coerced into accepting the Offset Provision because of the size of the funds offered under ARPA and the fraught financial situation brought on by the pandemic. Arizona sought a preliminary injunction enjoining the federal defendants from recouping funds or otherwise enforcing the Offset Provision, and declaratory relief that the Offset Provision violated the Constitution. The district court dismissed for lack of subject matter jurisdiction, finding that Arizona did not demonstrate a cognizable injury in fact to establish standing.

The panel held that Arizona had standing to challenge ARPA both because there was a realistic danger of ARPA's enforcement, and because there was a justiciable challenge to the sovereignty of the State, which alleges infringement

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

on its authority to set tax policy and its interest in being free from coercion impacting its tax policy.

The panel addressed Arizona's three primary arguments for standing. First, Arizona under its compliance cost theory contended that the reporting requirements in the Treasury Department's Interim Final Rule (explaining how it would implement ARPA and the Offset Provision) established an injury in fact by imposing a regulatory burden on the States. The panel rejected this theory because standing is measured at the time of the complaint, and when the complaint was filed, there was not a required compliance scheme.

Second, Arizona alleged that the future injury it will suffer, if the Offset Provision is enforced against it, was sufficient to confer standing. In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014), the Supreme Court set forth three factors that must exist for a plaintiff to have standing to bring a pre-enforcement challenge to a law. The panel held that the first *Driehaus* factor – requiring an intent to do an act "arguably affected" by a constitutional interest – was met. In evaluating the second *Driehaus* factor, the panel determined whether Arizona's intended future conduct was proscribed by ARPA. Here, Arizona accepted ARPA funds, certified that it will meet ARPA's conditions, and passed a $1.9 billion tax cut. The panel held that Arizona's tax cut would presumably lead to a reduction in Arizona's net tax revenue, which meant that Arizona had taken all requisite steps to violate the Offset Provision short of using ARPA funds "directly or indirectly" to offset a net revenue reduction from its tax cut. This was enough to satisfy the second factor. The panel held that the third *Driehaus* factor, concerning whether there was a credible threat of enforcement, had dispositive weight in the case. The $1.9 billion tax cut Arizona passed was a sufficiently concrete

plan. The panel disagreed with the district court's rejection of this theory of standing, and held that Arizona has alleged a sufficiently credible threat of enforcement to bring a pre-enforcement challenge to ARPA's Offset Provision.

Third, the panel examined Arizona's sovereign injury theory of standing in the alternative. Arizona contended that the Offset Provision inflicted cognizable sovereign injuries upon the States by being unconstitutionally ambiguous and coercive. Because the panel was reviewing an order on a motion to dismiss, the panel took all allegations of the complaint as true. The panel saw no reason to dispute, deny, or discredit Arizona's contention at this stage that ARPA and its Offset Provision specifically had a coercive impact on the State. Here, Arizona alleged sufficiently concrete and particularized harms to its ability to exercise its sovereign prerogatives, intangible as those prerogatives may be. The quasi-contractual funding offer at issue here can be challenged by Arizona at the outset for offering conditions that are unconstitutionally ambiguous or coercive. States have standing when an allegedly unconstitutional funding offer is made to them, and they do not need to first violate a condition of an allegedly unconstitutional contract to have standing to challenge it. The panel held that the district court erred in dismissing Arizona's claim for lack of subject matter jurisdiction.

After concluding that Arizona had standing to bring its challenge to ARPA on two theories, the panel declined to consider the merits of Arizona's constitutional claims. The panel remanded for the district court to consider the merits of Arizona's Spending Clause and Tenth Amendment claims.

Concurring, Judge R. Nelson agreed that Arizona had standing to challenge the Offset Provision on its theory of sovereign injury and concurred in Section II of the majority's opinion. He disagreed with the majority's conclusion that Arizona alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *See Susan B. Anthony List*, 573 U.S. at 159. Arizona never alleged that it had taken action proscribed by the Offset Provision, and this lack of such an allegation doomed Arizona's argument for standing on this basis.

**COUNSEL**

Drew C. Ensign (argued), Deputy Solicitor General; Wilson C. Freeman, Senior Litigation Counsel; Robert J. Makar, Assistant Attorney General; Joseph A. Kanefield, Chief Deputy & Chief of Staff; Brunn ("Beau") W. Roysden III, Solicitor General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Plaintiff-Appellant.

Daniel Winik (argued), Mark B. Stern, and Alisa B. Klein, Appellate Staff; Brian M. Boynton, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Jacob Huebert, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Arizona, for Amicus Curiae Goldwater Institute.

Dave Yost, Attorney General; Benjamin M. Flowers, Solicitor General; Zachery P. Keller and Sylvia May Davis, Deputy Solicitors General; Office of the Attorney General,

Columbus, Ohio; Steve Marshall, Alabama Attorney General; Treg R. Taylor, Alaska Attorney General; Leslie Rutledge, Arkansas Attorney General; Ashley Moody, Florida Attorney General; Lawrence G. Wasden, Idaho, Attorney General; Tom Miller, Iowa Attorney General; Derek Schmidt, Kansas Attorney General; Daniel Cameron, Kentucky Attorney General; Jeff Landry, Louisiana Attorney General; Lynn Fitch, Mississippi Attorney General; Austin Knudsen, Montana Attorney General; Douglas J. Peterson, Nebraska Attorney General; John M. Formella, New Hampshire Attorney General; Wayne Stenehjem, North Dakota Attorney General; John M. O'Connor, Oklahoma Attorney General; Alan Wilson, South Carolina Attorney General; Jason Ravnsborg, South Dakota Attorney General; Herbert H. Slatery III, Attorney General and Reporter of Tennessee; Ken Paxton, Texas Attorney General; Sean D. Reyes, Utah Attorney General; Patrick Morrisey, West Virginia Attorney General; for Amici Curiae States of Ohio, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, New Hampshire, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia.

Paul D. Clement, Erin E. Murphy, Kasdin M. Mitchell, Laura E. Wolk, and Elizabeth Hedges, Kirkland & Ellis LLP, Washington, D.C.; Daryl Joseffer and Paul Lettow, U.S. Chamber Litigation Center, Washington, D.C.; Karen Harned and Rob Smith, NFIB Small Business Legal Center, Washington, D.C.; for Amici Curiae Chamber of Commerce of the United States of America, and National Federation of Independent Business Small Business Legal Center.

Joseph D. Henchman, National Taxpayers Union Foundation, Washington, D.C., for Amicus Curiae National Taxpayers Union Foundation.

**OPINION**

GOULD, Circuit Judge:

It is well established that Congress has the power pursuant to the Spending Clause to pass legislation authorizing federal grants to the States that come with strings attached. For the most part, cases challenging Spending Clause legislation come to us arising from a specific dispute between the federal government and the recipient of federal funds. Usually, the federal government will claim that the recipient violated a condition that Congress placed on the federal grant and demand repayment. The recipient, in turn, will claim that the condition on the funds violates the limits of the Spending Clause, as enumerated in *South Dakota v. Dole*, 483 U.S. 203 (1987).

This appeal, however, requires us to decide whether a State has standing to challenge the constitutionality of Spending Clause legislation before a specific and concrete dispute arises between grantor and grantee. We hold that Arizona has standing to challenge the American Rescue Plan Act, 42 U.S.C. § 802(c)(2)(A), ("ARPA" or "the Act"), both because there is a realistic danger of ARPA's enforcement, and because there is a justiciable challenge to the sovereignty of the State, which alleges infringement on its authority to set tax policy and its interest in being free from coercion impacting its tax policy.

## BACKGROUND

Congress passed the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4, in March 2021 to help state, local, and tribal governments mitigate the ongoing effects of the COVID-19 pandemic.  ARPA provides nearly $200 billion in new federal grants to States.  42 U.S.C. § 802(b)(3)(A).  Arizona accepted ARPA funds and expects to receive $4.7 billion in total aid from the Act, equivalent to about a third of Arizona's total budget for the 2022 fiscal year.

Like most federal funding, ARPA funds come with conditions attached.  The Act delineates permissible uses for its funds:

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;
>
> (B) to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers . . . or by providing grants to eligible employers that have eligible workers who perform essential work;
>
> (C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency . . . ; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1). In addition to specifying permissible uses for the funds, ARPA also stipulates impermissible uses. First, no State or territory may use ARPA funds "for deposit into any pension fund." *Id.* § 802(c)(2)(B). Second, the statute contains a provision—challenged in this appeal—prohibiting a State from using ARPA funds to subsidize a tax cut or otherwise offset a reduction in state net tax revenue. More specifically, this condition (hereinafter the "Offset Provision") provides:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 803(c)(4) of this title to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A). If a State wants to accept federal money under ARPA, it must certify to the Treasury Department that it will use the funds "in compliance with" these conditions. *Id.* § 802(d)(1). ARPA provides that if a State violates the Offset Provision, it must repay the Treasury the lesser value of the amount of funds used in violation of the condition or the total amount of funds received under the Act. *Id.* § 802(e). ARPA also authorizes the Secretary of the Treasury to "issue such regulations as may be necessary or

appropriate to carry out this section." *Id.* § 802(f). It is this Offset Provision which is the subject of the State's challenge.

The Treasury Department issued an Interim Final Rule ("IFR") in May 2021 explaining how it would implement ARPA and its conditions, including the Offset Provision. *See Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26,786 (May 17, 2021) (codified at 31 C.F.R. § 35.1 et seq.). Specifically, the IFR provides that a State will

> be considered to have used [ARPA funds] to offset a reduction in net tax revenue resulting from changes in law, regulation, or interpretation if, and to the extent that, the recipient government could not identify sufficient funds from sources other than the [ARPA funds] to offset the reduction in net tax revenue.

86 Fed. Reg. at 26,807. Recognizing that "money is fungible," the IFR states that even if ARPA funds "are not explicitly or directly used to cover the costs of changes that reduce net tax revenue, those funds may be used in a manner inconsistent with the statute by indirectly being used to substitute for" state funds that would "otherwise have been needed to cover" the reduction. *Id.* at 26,807.

To identify direct or indirect offsets, the IFR provides state governments with a four-step framework. First, using the State's "existing approach for measuring the effects of fiscal policies," a State must "identify and value" any actions that it predicts will reduce tax revenue in a given reporting year. *Id.* at 26,809. Second, the State must "calculate the total value of all covered changes" to determine if there was

a reduction in net tax revenue. *Id.* If the reduction is below a *de minimis* level—1 percent of the reporting year's baseline—the Offset Provision is not implicated. *Id.* Third, if a State's annual tax revenue exceeds the amount received for fiscal year ending in 2019 adjusted for inflation, it is in a "safe harbor" and does not violate the Offset Provision. *Id.* If, however, there has been more than a *de minimis* reduction in net tax revenue from a change in state law, the fourth step is for the State to "identify any sources of funds" that have been used to offset the reduction. *Id.* at 26,809. Macroeconomic growth, increases in revenue, and spending cuts in areas where the State has not spent ARPA funds can all be used to offset reductions in net tax revenue without violating the Offset Provision. *See id.* at 26,809. A State would be required only to repay any amount of federal funds from ARPA that was used to offset a reduction. *Id.* The IFR also outlines a detailed "Recoupment Process" that allows states to submit a request for reconsideration if the Treasury Department determines they violated the Offset Provision. *Id.* at 26,811–12.

## PROCEDURAL HISTORY

Arizona sued the federal defendants in March 2021, soon after President Biden signed the Act into law, alleging that ARPA violates the Spending Clause and the Tenth Amendment. Specifically, Arizona alleges that ARPA's Offset Provision is unconstitutionally ambiguous under the Spending Clause because the statute does not specify what it means to "indirectly offset a reduction in the [State's] net tax revenue." Arizona contends that the Offset Provision could be broadly interpreted as a "blanket prohibition forbidding States from cutting taxes in any manner whatsoever." Second, the State contends that ARPA violates the Spending Clause by being unduly coercive and unconstitutionally

commandeering its sovereign power to set its own tax policy in violation of the Tenth Amendment. In essence, Arizona contends that it was coerced into accepting the Offset Provision because of the size of the funds offered under ARPA and the fraught financial situation brought on by the pandemic.

Arizona sought a preliminary injunction enjoining the federal defendants from recouping funds or otherwise enforcing the Offset Provision, as well as declaratory relief that the Offset Provision violates the Constitution. The district court dismissed the case for lack of subject matter jurisdiction, finding that Arizona did not demonstrate a cognizable injury in fact to establish standing.

The district court rejected all five of Arizona's arguments for standing. First, Arizona argued that it was injured by the Offset Provision's ambiguity, which prevented it from understanding the limits placed on the federal funds. Reasoning that Congress met its duty under the Spending Clause by making the condition "explicitly obvious," the district court rejected this theory. Second, Arizona argued that the Offset Provision's ambiguity put Arizona policymakers in an unsettling position of uncertainty because they do not know how to avoid violating ARPA's conditions. The district court found this argument unpersuasive because Arizona policymakers passed a $1.9 billion tax cut, and Arizona did not offer evidence that their decision was at all affected by ARPA's conditions. Third, Arizona claimed it was injured by the compliance costs imposed by the Treasury Department's IFR. The district court rejected this theory because in ARPA, Congress vested the Secretary with the authority to order States to produce information, and the district court found these compliance costs to be "part and parcel" of ARPA. Fourth, Arizona

relied upon caselaw that recognizes standing for pre-enforcement challenges where there is a realistic danger of enforcement, arguing that here there is a realistic threat that the Offset Provision will be enforced. The district court disagreed, concluding that Arizona did not demonstrate a substantial likelihood that the condition would actually be enforced against it in the way Arizona fears. Finally, Arizona argued that it suffered an injury by being coerced into accepting the allegedly unconstitutional condition because of ARPA's size and the pandemic-driven need for the ARPA funds. The district court rejected this final theory for standing, reasoning that Arizona would not lose any existing federal funding if it violated the Offset Provision and that Arizona did not allege facts showing it has undergone financial strain.

Arizona's suit is one of six nearly identical challenges to ARPA brought by various states, and in those cases the district courts have reached different conclusions on standing. *Compare Ohio v. Yellen*, 539 F. Supp. 3d 802, 813–17 (S.D. Ohio 2021), *West Virginia v. U.S. Dep't of Treasury*, 2021 WL 2952863, at *6–7 (N.D. Ala. July 14, 2021), *Kentucky v. Yellen*, 2021 WL 4394249, at *3 (E.D. Ky. Sept. 24, 2021), *with Arizona v. Yellen*, 2021 WL 3089103, at *2–5 (D. Ariz. July 22, 2021), *Missouri v. Yellen*, 538 F. Supp. 3d 906, 912–13 (E.D. Mo. 2021).

Because Article III empowers this Court only to adjudicate "live cases or controversies," we will not wade into disputes that would require us to "issue advisory opinions" or "declare rights in hypothetical cases." *Clark v. City of Seattle*, 899 F.3d 802, 808 (9th Cir. 2018) (quotation marks omitted). Only the injury-in-fact requirement for standing is contested in this case. An injury in fact is "an invasion of a legally protected interest" that is "concrete and

particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted). A "concrete" injury is one that "actually exist[s]," meaning that it is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (quotation marks omitted).

Arizona's arguments for standing fall under three primary theories. First, Arizona contends that it has standing because of the compliance costs imposed by the Treasury Department's IFR. Second, Arizona relies upon caselaw permitting pre-enforcement challenges to statutes to support its argument that the future injury Arizona will suffer, if the Offset Provision is enforced against it, is sufficient to confer standing. Third, Arizona contends that the Offset Provision inflicts cognizable sovereign injuries upon the States by being unconstitutionally ambiguous and coercive. We consider each theory in turn, giving *de novo* review to issues of standing. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 652 (9th Cir. 2021).

## DISCUSSION

We first address Arizona's compliance cost theory, which contends that the reporting requirements in the Treasury's IFR establish an injury in fact by imposing a regulatory burden on the States. This theory fails for the simple reason that standing is measured at the time of the complaint. *Lujan*, 504 U.S. at 569 n.4. When the complaint was filed, there was not a required compliance scheme. The compliance costs Arizona complains of come from the IFR, which was promulgated after Arizona filed its complaint. We agree with the district court that Arizona's compliance cost theory should be rejected.

## I.

We next consider whether there is a "realistic danger of enforcement" giving rise to a cognizable injury for standing. Because Arizona accepted ARPA funds and then passed a tax cut, Arizona believes that there is a realistic danger that it will be required to return some of the ARPA funds it has accepted, which would amount to a concrete injury in fact. The district court rejected this theory, concluding that Arizona did not demonstrate a substantial likelihood that the condition would actually be enforced against it.  Important to the district court's analysis was that Arizona had not claimed to have "directly or indirectly" used ARPA funds to offset its tax cut, nor had Arizona claimed the tax cut it passed would result in a net tax revenue reduction triggering the Offset Provision.  We have previously held a "likely 'loss of funds promised under federal law'" satisfied Article III standing.  *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)).  We must here decide whether the potential future recoupment of federal funds under ARPA is similarly sufficient in this case to confer standing.

Three factors must exist for a plaintiff to have standing to bring a pre-enforcement challenge to a law, as explained by the Supreme Court in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  The plaintiff must allege (1) an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) "but proscribed by a statute," and (3) there must be "a credible threat of prosecution" under the statute.  *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The first *Driehaus* factor requires an intent to do an act "arguably affected" by a constitutional interest. Determining whether Arizona meets this factor to a degree

resembles an invitation to reach the merits of Arizona's constitutional claims. But the Supreme Court has cautioned that standing "in no way depends on the merits" and has instructed us to take as true all material allegations in the complaint and construe the complaint in favor of the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Viewing the Offset Provision through Arizona's eyes, we must accept—for standing purposes—its allegations that the condition is unconstitutionally ambiguous and coercive. We conclude that the first *Driehaus* factor is met.

In evaluating the second *Driehaus* factor, we must determine whether Arizona's intended future conduct is proscribed by ARPA. To do so, we first examine what conduct is proscribed by the Offset Provision to evaluate whether Arizona's desired course of conduct falls under the provision's sweep. The Offset Provision is triggered by specific events. A State must first accept funds under ARPA and certify that it will meet ARPA's conditions. Then, it must make a change to state law that results in a "reduction in net tax revenue." 42 U.S.C 802(c)(2)(A). Finally, to violate the Offset Provision, the State must then use federal ARPA funds to "directly or indirectly" offset the reduction in net tax revenue. *Id.* All these steps must be taken to trigger and violate the Offset Provision.

Here, Arizona has accepted ARPA funds, certified that it will meet ARPA's conditions, and passed a $1.9 billion tax cut. The district court rejected Arizona's theory of standing under *Driehaus* because Arizona had not claimed that its tax cut will result in a reduction in its "net tax revenue," nor claimed to have "directly or indirectly" used ARPA funds to offset the tax cut. On this point we diverge with the district court because its reasoning approximates requiring Arizona to admit to violating a law in order to have standing to

challenge it, a prerequisite the Supreme Court has repeatedly rejected. *See Driehaus*, 573 U.S. at 163 (2014) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007); *Free Enter. Fund. v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010). Presumably, a $1.9 billion tax cut will lead to a reduction in Arizona's net tax revenue; it is hard for us to imagine how a tax cut of this magnitude would not. This means that Arizona has taken all requisite steps to violate the Offset Provision short of using ARPA funds "directly or indirectly" to offset a net revenue reduction from its tax cut. Unlike the district court, we do not require Arizona to explicitly confess to intended future conduct that is violative of the law it seeks to challenge.

The concurrence suggests that Arizona "has alleged only an intention to pass a tax cut." But Arizona has done more than announce an intention to pass a tax cut; it has passed one. The only thing Arizona has not yet done is allege an intention to use ARPA funds "directly or indirectly" to offset the resulting net revenue reduction from its tax cut. Because doing so amounts to a confession that Arizona will, in fact, violate the law, and the Supreme Court has instructed that plaintiffs need not do that, we disagree with the concurrence on this point.

The third *Driehaus* factor, concerning whether there is a credible threat of enforcement, has dispositive weight in this case. We have developed a framework to evaluate whether a claimed threat of enforcement is genuine enough to confer standing. We consider (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," (2) "whether the prosecuting authorities have communicated

a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (citing *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1126–27 (9th Cir. 1996)). Where the challenged statute is new, as here, the history of past enforcement carries little, if any, weight. *Cal. Trucking*, 996 F.3d at 652.

A concrete plan need not be "cast in stone" but must be "more than a hypothetical intent to violate the law." *Thomas*, 220 F.3d at 1139. The $1.9 billion tax cut Arizona passed is a sufficiently concrete plan in our view. As described above, we do not require Arizona to admit to violating the law or having a desire to do so.

That the federal government has not disavowed enforcement of the Offset Provision is evidence of an intent to enforce it. *Cal. Trucking*, 996 F.3d at 653. And in this case, there is affirmative conduct by the Treasury Department evincing an intent to enforce the Offset Provision. In response to an inquiry from a group of Attorneys General, the Secretary of the Treasury wrote a letter confirming that the Offset Provision will be enforced (although, the Secretary said, not in the way feared by the States). In *California Trucking*, we recognized a sufficient intent to enforce a law where a state had "sent letters to businesses notifying them" of its interpretation of a new requirement under state law. 996 F.3d at 653. Like the letters in *California Trucking*, we view the Secretary's letter as showing an intent to enforce the Offset Provision, albeit in a cooperative fashion inviting "ongoing dialogue" between the Treasury and the States. In addition to the Secretary's letter, the Treasury's IFR outlines the detailed and specific process that will be used to recoup funds from

States that violate the Offset Provision, giving more evidence of the government's intent to enforce the challenged provision. 31 C.F.R. § 35.10. The concurrence suggests that this factor is not met because the Treasury has disavowed enforcing the law in the way Arizona fears. But the Secretary's letter still affirms the Treasury's intent to enforce the Offset Provision against the States, even if it clarifies that nothing in ARPA "prevents States from enacting a broad variety of tax cuts." The Secretary's letter and the recoupment process outlined in the IFR show the federal government's intent to enforce the Offset Provision.

Arizona has done everything short of confessing a desire to use ARPA funds "directly or indirectly" to offset the tax cut it passed. We disagree with the district court's rejection of this theory of standing and hold that Arizona has alleged a sufficiently credible threat of enforcement to bring a pre-enforcement challenge to ARPA's Offset Provision. There is a realistic danger that Arizona, after accepting federal funds under ARPA and passing a billion dollar tax cut, will be forced to repay federal funds for directly or indirectly using those funds to offset its tax cut, in violation of the Offset Provision. This feared future injury is sufficiently realistic and credible to confer standing under *Driehaus* and our caselaw describing its three-factor test.

## II.

We examine Arizona's sovereign injury theory of standing in the alternative. In our dual sovereign system, Arizona enjoys "special solicitude in our standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). This special standing has relevance here, where Arizona alleges that ARPA infringes upon its sovereign rights. Specifically, Arizona argues that the Offset Provision's ambiguity prevents Arizona from being able to exercise its choice

voluntarily to accept ARPA funds and understand the consequences of agreeing to ARPA's conditions. Arizona also contends that by coercing the States into accepting the Offset Provision, ARPA threatens Arizona's sovereign prerogative to "tax its residents as it sees fit."

If we were reviewing these issues on a record replete with evidence submitted and a summary judgment ruling, and looking only for an issue of fact requiring trial, we might be somewhat skeptical of the degree to which Arizona is being coerced in derogation of its sovereign rights. But we do not review this today on appeal of a summary judgment ruling. We are reviewing only an order on a motion to dismiss which dismissed the complaint for lack of subject matter jurisdiction. As we have noted above, in this context we must take all allegations of the complaint as true. *See supra* Part I (citing *Warth*, 422 U.S. at 500). We see no reason under normal juristic standards for us to dispute, deny, or discredit Arizona's contention at this stage that ARPA and its Offset Provision specifically have a coercive impact on the State.

We examine Arizona's sovereign injury theory for standing through the lens of Spending Clause legislation being "in the nature of a contract." *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In *Pennhurst*, a class of residents at a Pennsylvania institution for people with disabilities challenged the conditions of their confinement, seeking closure of the institution. *Id.* at 5–6. The plaintiffs relied upon a provision in a federal grant program calling for the "least restrictive" treatment setting to argue that this provision created a binding condition upon the States in how they used federal funds to treat people with disabilities. *Id.* at 7. Rejecting that this provision created a

retroactive funding condition upon the States, the Court likened federal grants to contracts:

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.

*Id.* at 17 (internal citations omitted).

A few years later in *South Dakota v. Dole*, the Court articulated the outer bounds of Congress's authority under the Spending Clause to attach conditions upon grants of federal funding. 483 U.S. 203, 207–08 (1987). One limit is that spending must be in pursuit of the "general welfare," a broad and deferential term. *Id.* at 207. A second limit is that "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* (alterations in original) (quoting *Pennhurst*, 451 U.S. at 17). Third, any conditions should relate to the federal interest implicated by the spending. *Id.* Fourth, conditions must not violate other constitutional provisions. *Id.* at 208. The Court further noted that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* at 211

(quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).

Arizona seizes upon several of these limitations to bring a facial challenge—or so we interpret—to ARPA's Offset Provision.[1]      To Arizona, the inherent limitations on Congress's power to "lay and collect Taxes" and "provide for the . . . general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, create constitutionally-imposed and enforceable criteria that "contractual" funding offers from the federal government must meet.  When Congress does not meet one of these criteria, and say, extends a federal grant with ambiguous or coercive terms to the States, Arizona contends that this offer offends state sovereignty and gives rise to a cognizable injury in fact.  We agree.  We are mindful of the longstanding principle that federal courts "are without jurisdiction" to adjudicate "abstract questions of political power, of sovereignty."  *Massachusetts v. Mellon*, 262 U.S. 447, 484–85 (1923).  But intangible harms can be concrete, *Spokeo*, 578 U.S. at 340, and here, Arizona has alleged sufficiently concrete and particularized harms to its ability to exercise its sovereign prerogatives, intangible as those prerogatives may be.  Just as a contract can be challenged under state law for containing ambiguous terms or being a product of duress, so too do we think that the quasi-contractual funding offer at issue here can be challenged by Arizona at the outset for offering conditions that are unconstitutionally ambiguous or coercive.    States have standing when an allegedly unconstitutional funding offer is made to them, and they do not need to first violate a

---

[1] Whether Arizona's Spending Challenge is facial or as applied was not briefed by the parties, and we suggest that they brief this issue before the district court.

condition of an allegedly unconstitutional contract to have standing to challenge it.

In rejecting Arizona's theory of injury based upon having a right to an unambiguous funding offer from the federal government, the district court concluded that the Spending Clause requires Congress to be unambiguous about the *existence* of a condition, not what the condition *requires*. Whether or not the district court is correct that Congress "fulfilled its duty" in making the existence of the Offset Provision known, this analysis examines whether the condition is ambiguous, and not whether being offered ambiguous terms is a cognizable injury. Similarly, in rejecting Arizona's theory of injury based upon being coerced into accepting the Offset Provision, the district court pointed to Arizona's delay in accepting funds and the lack of evidence of any financial strain to conclude there was not standing. This analysis, however, evaluates the merits of whether ARPA is coercive instead of evaluating whether being coerced is a cognizable injury. A district court should be cautious not to confuse perceived "weakness on the merits with absence of Article III standing." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011)).

At this early juncture, we must take Arizona's allegations to be true. *See Warth*, 422 U.S. at 499–502. The federal government and the district court discredit Arizona's interpretation of the Offset Provision, but differences in what the Offset Provision means and how it may be enforced go to the merits of Arizona's claims, and not to whether a court has jurisdiction to hear these claims. *See Cath. League for Religious & C.R. v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc); *City and Cnty. of San*

*Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018). In *City and County of San Francisco v. Trump*, the parties "disputed the scope of the challenged measure," but we held it was enough for standing purposes that if the plaintiff's interpretation of the statute was correct, it would "suffer serious consequences." 897 F.3d at 1236. Here, Arizona has demonstrated that if the Offset Provision is as ambiguous and coercive as it alleges, it will face serious consequences in losing control over its taxing policies and being held to a funding offer that it does not understand. Whether there is merit to these feared consequences is a separate matter, but for today, we hold that the district court erred in dismissing Arizona's claim for lack of subject matter jurisdiction.

## III.

Concluding that Arizona has standing to bring its challenge to ARPA, both on its theory of realistic danger of enforcement, and alternatively, on its theory of injury to sovereign rights, we decline to turn to the merits of Arizona's constitutional claims. We think it is a better procedure to have the district court make a ruling on the merits in the first instance, as the district court's views can only help our court to resolve the difficult issues presented.[2] We reverse the district court's ruling on standing and conclude that the district court has subject matter jurisdiction to hear this case. We remand for the district court to consider the merits of Arizona's Spending Clause and Tenth Amendment claims.

---

[2] We also note that, after we heard argument in this case, the Treasury Department published a final rule implementing ARPA and the Offset Provision. *Coronavirus State and Local Fiscal Recovery Funds*, 87 Fed. Reg. 4,338 (Jan. 27, 2022). In considering the merits, the district court also will have the benefit of that final rule implementing ARPA.

## CONCLUSION

Because standing "in no way depends on the merits," *Warth*, 422 U.S. at 500, our decision today should not be construed as commenting in any way on the merits of Arizona's case. We limit our decision to the narrow issue of standing and hold that the district court has subject matter jurisdiction to hear this challenge to ARPA.

**REVERSED AND REMANDED.**

---

R. NELSON, Circuit Judge, concurring:

I agree that Arizona has standing to challenge the Offset Provision on its theory of sovereign injury and concur in Section II of the majority's opinion.

I disagree, however, with the majority's conclusion that Arizona has alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Arizona never alleged that it has taken (or would take, if not for fear of enforcement) action proscribed by the Offset Provision. The lack of such an allegation dooms Arizona's argument for standing on this basis.

Article III of the Constitution limits our jurisdiction to "Cases" and "Controversies." U.S. Const., art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Driehaus*, 573 U.S. at 157 (alteration in original) (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).
"To establish Article III standing, a plaintiff must show
(1) an 'injury in fact,' (2) a sufficient 'causal connection
between the injury and the conduct complained of,' and (3) a
'likel[ihood]' that the injury 'will be redressed by a
favorable decision.'" *Id.* at 157–58 (alteration in original)
(quoting *Lujan*, 504 U.S. at 560–61). Generally, the injury-
in-fact requirement is satisfied by an injury that has already
occurred.     But we also recognize that threatened
enforcement of a law can create an injury in fact. *Id.* at 158.
In those circumstances, we may consider pre-enforcement
challenges "under circumstances that render the threatened
enforcement sufficiently imminent." *Id.* at 159. A mere
possibility of future enforcement will not do; the likelihood
of future enforcement must be "substantial." *California v.
Texas*, 141 S. Ct. 2104, 2114 (2021) (quoting *Driehaus*, 573
U.S. at 164); *see also Massachusetts v. Mellon*, 262 U.S.
447, 488 (1923) ("The party who invokes the power [of
Article III courts] must be able to show, not only that the
statute is invalid, but that he has sustained or is immediately
in danger of sustaining some direct injury as the result of its
enforcement . . . .").

   Likelihood of enforcement is substantial when a plaintiff
alleges (1) "an intention to engage in a course of conduct
arguably affected with a constitutional interest," (2) "but
proscribed by a statute," and (3) "there exists a credible
threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159
(quoting *Babbitt*, 442 U.S. at 298). In *Driehaus*, for
example, two advocacy organizations challenged an Ohio
statute prohibiting "false statements" in political campaigns.
*Id.* at 151. The law allowed any person with knowledge of
a purported violation to file a complaint with the State. *Id.*
at 164. One organization had already been subject to
enforcement proceedings, initiated after a candidate filed a

complaint about the organization's attempts to display a billboard stating that the candidate "voted FOR taxpayer-funded abortion." *Id.* at 154. After losing the election, the candidate moved to withdraw his complaint. The plaintiff organizations challenged the state law, alleging that they "intend[ed] to engage in substantially similar activity in the future" and "face[d] the prospect of [their] speech and associational rights again being chilled" by future complaints. *Id.* at 155 (second alteration in original).

The Supreme Court held that the organizations had standing to bring a pre-enforcement action. The organizations alleged "specific statements they intend[ed] to make in future election cycles" that would be prohibited. *Id.* at 161. The text of the statute covered the plaintiffs' intended speech ("concerning the voting record of a candidate," *id.* at 152), and the statute had been enforced against one of the plaintiffs, *id.* at 162. The Court did not require plaintiffs "to confess that [they] will in fact violate th[e] law" and held that the organizations had established that their intended future conduct would be proscribed by the statute because it would subject them to future enforcement proceedings. *Id.* at 163.

The Court held that the final requirement—a substantial threat of future enforcement—was satisfied for three reasons. First, there was a history of past enforcement because one organization had been the subject of prior enforcement proceedings. *Id.* at 164. Second, the credibility of the threat was bolstered by the fact that any person could file a complaint. *Id.* Because "the universe of potential complainants [was] not restricted to state officials who [were] constrained by explicit guidelines or ethical obligations," there was a substantial risk of complaints from a multitude of parties, including political opponents. *Id.*

Finally, the Court noted that enforcement proceedings were frequent and the commission "ha[d] not disavowed enforcement if petitioners make similar statements in the future." *Id.* at 165.

We have followed a similar approach in this Circuit. In *Real v. City of Long Beach*, we held that a plaintiff had standing to challenge a city's zoning ordinance when he alleged an intent to open a tattoo shop without the required permit. 852 F.3d 929, 934–35 (9th Cir. 2017). Like the advocacy organizations in *Driehaus*, the plaintiff in *Real* had alleged a specific intent to engage in conduct proscribed by the challenged ordinance. *Id.* And, as in *Driehaus*, enforcement proceedings had happened in the past (albeit against non-plaintiffs). *Id.* The City vigorously enforced its zoning ordinances and told the plaintiff that he would be subject to enforcement proceedings. *Id.* The plaintiff had standing to challenge the ordinance because it appeared "likely that the City would take action against [him] if he opened a tattoo shop." *Id.* at 935.

More recently, we held that a trucking trade association had standing to challenge a new California law that codified a test for classifying workers as either employees or independent contractors. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 649 (9th Cir. 2021). The trade association established a "concrete plan" to violate the law by alleging that its members actively maintained policies that were "in conflict with" California law. *Id.* at 653. The association also established a substantial likelihood of enforcement proceedings because the state had refused "to disavow enforcement" against association members and declared its "intention to enforce" the new law. *Id.* Because the law was relatively new, we noted that the history of enforcement carried "little weight." *Id.* Even so, the State had done more

than declare its intentions; it had sent letters to businesses notifying them that they were subject to the law and had commenced several prosecutions against businesses for violating the law. *Id.*

On the other hand, we found standing lacking in cases like *Safer Chemicals, Healthy Families v. EPA*, 943 F.3d 397 (9th Cir. 2019). In *Safer Chemicals*, we held that plaintiffs challenging agency rules do not have standing when "it is not even clear what [agency] procedures will be, let alone whether [the agency] will employ them in a way that injures" the plaintiffs. *Id.* at 415. Ambiguity in the challenged provisions hindered our ability to "predict whether [plaintiffs] will be harmed in the way they claim, or whether the [government] will in fact apply the[] rules as [plaintiffs] wish." *Id.* We explained that plaintiffs might have standing in the future, if the agency enforced the rule in the way feared by plaintiffs. *Id.* But we declined to make assumptions about how the government would enforce an ambiguous provision to create standing based on the plaintiffs' allegations. *Id.*

There are striking differences between the allegations in this case and the allegations in cases finding pre-enforcement standing. The Offset Provision prohibits states from using American Rescue Plan Act (ARPA) funds "to either directly or indirectly offset a reduction in the net tax revenue." 42 U.S.C. § 802(c)(2)(A). Arizona alleged only an intention to pass a tax cut (which it has now passed). It did not allege a reduction in net tax revenue, nor did it make any allegation about how a potential post-tax-cut budget would be structured. Unlike the large number of potential complainants in *Driehaus*, the universe of potential complainants in this case is limited to "officials . . . constrained by explicit guidelines or ethical obligations."

*See* 573 U.S. at 164.    And unlike the frequent past proceedings in *Driehaus* and *Real*, Treasury officials have never initiated enforcement proceedings under the Offset Provision.  Indeed, Treasury has explicitly disavowed any prohibition against states enacting tax cuts.  *See Real*, 852 F.3d at 934–35; *cf. Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) ("[C]laims of future harm lack credibility when . . . the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs.").

Arizona's pleadings leave us to make a series of factual and legal leaps to establish (1) an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) but proscribed by the Offset Provision, and (3) a credible threat of prosecution thereunder.  *See Driehaus*, 573 U.S. at 159.  Nowhere in its complaint does Arizona allege that it has (or plans to) directly or indirectly offset a reduction in net tax revenue.  For Arizona to have standing under *Driehaus*, we must infer that the contemplated tax cut will not be offset by macroeconomic growth or cuts in spending not affected by ARPA.  Then we must infer that Treasury will enforce the Offset Provision in a way that it has explicitly disavowed and never threatened.  Inventing standing with such assumptions is inconsistent with precedent.

A tax cut, on its own, does not fall within the Offset Provision's ambit.  Without more, we cannot infer both (1) a reduction in net tax revenue and (2) conduct that might count as an "offset."  Had Arizona alleged an intent to offset a reduction in net tax revenue in some specific way, it may have separately established standing under its pre-enforcement theory.  But as things stand, the specter of enforcement is too hypothetical to present a "Case" or "Controversy" for our review.